# FLORENCE MINING COMPANY *v.* BROWN.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE NORTHERN DISTRICT OF OHIO.

Argued December 1, 2, 1887. — Decided January 23, 1888.

The insolvency of the vendee in a contract for the sale and future delivery
of personal property in instalments, payment to be made in notes of the
vendee as each instalment is delivered, is sufficient to justify the vendor
for refusing to continue the delivery, unless payment be made in cash;
but it does not absolve him from offering to deliver the property in per-
formance of the contract if he intends to hold the purchasing party to
it: he cannot insist upon damages for non-performance by the insolvent
without showing performance on his own part, or an offer to perform,
with ability to make the offer good.

A check upon a bank in the usual form, not accepted or certified by its
cashier to be good, does not constitute an equitable assignment of money
to the credit of the holder, but is simply an order which may be counter-
manded, and whose payment may be forbidden by the drawer at any time
before it is actually cashed.

THE CASE is stated in the opinion of the court.

*Mr. Harvey D. Goulder* for appellant. *Mr. George D. Van Dyke* was with him on the brief.

*Mr. Francis J. Wing* for appellee.

MR. JUSTICE FIELD delivered the opinion of the court.

In February, 1883, three corporations, namely, the Lake Superior Iron Company, and the Jackson Iron Company, created under the laws of Michigan, and the Negaunee Concentrating Company, created under the laws of New York, filed a bill in chancery in the Circuit Court of the United States for the Northern District of Ohio against the defendant, Brown, Bonnell & Company, a corporation created under the laws of Ohio, alleging that they were creditors of the latter corporation, and designating the amounts of such indebtedness; that owing to the first two named corporations consist-

ing of certain promissory notes of the defendant, and that owing to the last named corporation being a judgment against the defendant in the Circuit Court rendered on that day. The bill purported to be filed, not only on behalf of the complainants, but also on behalf of all other creditors whom it represented to be so numerous that it was impossible to make them parties. It alleged that the defendant was insolvent; that it had long been engaged in the business of manufacturing iron, and had erected blast furnaces, rolling mills, and coke works, and had opened and operated coal mines; that its plant was of great value, as was also the good will of its business; and that it employed at least 4000 persons in its mills and works. It also alleged that vexatious litigation had been commenced against the defendant, and more was threatened; that such litigation was accompanied by attachments and seizures of property, and the threatened litigation would also be accompanied by like attachments and seizures, and they would give to the creditors who were pursuing them undue advantage over those complainants whose claims were not yet due, and work them irreparable injury; and that if such litigation should be further instituted, and the property of the defendant be attached, there was danger that it would be to a great extent destroyed, and its long established business broken up. It therefore prayed the appointment of a receiver to take charge of the assets and property of the defendant, and for further relief.

The defendant appeared at once to the bill, and thereupon, pursuant to the complainant's motion, Fayette Brown was appointed receiver of its assets and property.

In March, 1883, a supplemental bill was filed, setting forth that the property of the defendant was of such a peculiar nature that great and irreparable loss would be caused to the complainants and other of its creditors, unless its property should be preserved by the receiver in its entirety as a business during the time required to liquidate and adjust its affiairs; that the Negaunee Concentrating Company, one of the complainants, had recovered judgment against the defendant prior to the filing of the bill; that its recovery gave to the company

a lien upon all the real estate of the defendant within the jurisdiction of the court; that execution had been issued upon said judgment and been returned unsatisfied; that other claims for liens and priorities of payment had been made by creditors of the defendant, both secured and unsecured; and that many claims were made, the justice of which was doubtful, and many which were unliquidated. It therefore prayed the appointment of a special master to ascertain the priorities of liens and the rights and claims of creditors generally, and report to the court his findings.

The court thereupon made an order requiring all the creditors of the defendant to file their claims in the office of the clerk by petition stating their amount and nature; and in July following it appointed the special master prayed to determine the rights of the several creditors of the defendant who had, in accordance with its previous order, filed their claims with the clerk, and to marshal the liens and priorities of such claims.

Among the claims filed with the clerk pursuant to this order was one presented by the Florence Mining Company, a corporation of Michigan, for an amount alleged to be due to it upon a contract with Brown, Bonnell & Company for the sale of certain iron ores. Among the transactions had under the contract a check was given to the Florence Mining Company by Brown, Bonnell & Company, shortly before its failure, upon the Importers' and Traders' National Bank of New York, on account of a cash payment then due, which check, it was contended, operated as an equitable assignment of certain moneys then in the bank to its credit.

These matters were considered by the special master, who took testimony respecting them, and heard counsel thereon. He reported the amount due the Florence Mining Company, deducting from the price for the whole ore which was to be delivered the value of the quantity undelivered, estimated according to the contract price, and he reported against the alleged equitable assignment. Exceptions to his report were overruled, and the report was confirmed. To review this ruling the case is brought here on appeal.

The contract between the Florence Mining Company and
Brown, Bonnell & Company was made on the 13th of February, 1882. By it the Florence Mining Company agreed to
sell to Brown, Bonnell & Company 30,000 gross tons of Florence iron ore, of its standard quality, deliverable at Cleveland
and Ashtabula, during the season of navigation of 1882, at the
docks of the New York, Pennsylvania and Ohio Railway
Company, or of the Lake Shore and Michigan Southern Railway Company, and as near one-sixth of the total quantity per
month as practicable; "said ore to be paid for by the said
Brown, Bonnell & Company at the rate of $5.75 per ton, in eight
equal payments of $21,562.50 each, payable on the 15th days
of May, June, July, August, September, October, November,
and December next, respectively, in cash, all in funds par in
Cleveland or New York, making a total of one hundred and
seventy-two thousand five hundred dollars' ($172,500). The
said ore is to be consigned to Florence Mining Company, and
to be subject to their order until forwarded from docks. It is
further agreed that promissory notes of Brown, Bonnell &
Company, drawn at four months from date, on which a cash
payment is due, with interest at the rate of six per cent per
annum added into the face of note (making $21,993.75), may
be substituted for either of the above cash payments except
the last two due in November and December next, which are
to be paid only in cash. Said Brown, Bonnell & Company for
the above named consideration hereby agrees to buy, receive
and pay for said ore as above mentioned."

The Florence Mining Company had the ore on the docks
designated by November 1st, 1882. It was all consigned to
the company, as provided in the contract, and no part of it was
delivered to the vendee except upon the order of the company,
which continued the owner of the ore not delivered. Shipments to the vendee were during this period, that is, from the
date of the contract until November 1st, 1882, suspended at
the vendee's request for about two months, but at other times
shipments were made as the ore was wanted. Prior to February 19th, 1883, the vendor had delivered to the vendee 20,762
tons of the ore, and had the remaining 9238 tons on hand,

when the vendee became insolvent, and the receiver of its assets and property was appointed by the court. On the day previous to this appointment, the vendor, having reason to fear the insolvency of the vendee, ordered the suspension of any further shipments of ores. No shipments to the vendee were subsequently made, nor did the vendor offer to make any, or give notice that it was ready to deliver the ore. The statement of its agent, that he asked the receiver to buy ore of the company, does not show any offer to deliver the ore under the contract, nor was it intended as such proof. In its petition setting forth its claim, filed with the clerk of the court, the company alleged that it was at all times ready, willing, and able to perform the contract on its part, but that the vendee, by reason of its insolvency and the appointment of a receiver, was unable to take and pay for the ore remaining undelivered. These allegations were not admitted before the special master; but, if true, the fact would not constitute any performance of the contract on its part without an offer to deliver the balance, or, at least, without notice to the vendee, or its receiver, of a readiness to do so. The insolvency of one party to a contract does not release the other from its obligations, provided, always, the consideration promised, if money, be paid, or if the consideration be the note or other obligation of the insolvent, money be tendered in its place. The mining company contended that it should be allowed the difference between the contract price of the undelivered ore, $5.75 per ton, and the market price for it at the time of the appointment of the receiver, which was only $4.50 per ton, making a difference of $11,577. This contention rested, as we have seen, solely upon the fact of the insolvency of the vendee before the whole of the ore was delivered; but that fact, if excusing the delivery of the balance without payment, did not release the company from offering to deliver the property in performance of the contract, if it intended to hold the purchasing party to the contract. It could not insist upon damages for non-performance of the contract by the other party without showing performance or an offer to perform it on its part with an ability to make good the offer if accepted.

Nor did the vendee or its receiver call upon the vendor for the balance of the ore and offer cash in payment. Its non-action for the enforcement of the contract and its silence on the subject was evidence that it desired to rescind the contract; and the action of the vendor, its suspension of further shipments to the vendee, and subsequent failure to deliver the balance of the ore, or to call upon the vendee to comply with the contract, was evidence that it also desired to rescind the contract. The master was therefore justified in holding that the contract was in fact rescinded by the consent of both parties.

Numerous cases have been cited to us upon the conduct which a vendor should pursue to preserve his rights under a contract for the sale of goods on credit, when he has refused to proceed with its performance upon learning of the insol-. vency of the vendee, but they exhibit so much difference of judicial opinion on the subject that it is difficult, if not impossible, to reconcile them. Some of the divergences of opinion may perhaps be traced to the different position of the vendor, where he has sold the goods on credit, the title passing immediately, but has stopped some of them *in transitu*, and where he has merely contracted to sell the goods, the delivery to be made by instalments, and payment made with each delivery, the title only then vesting in the vendee. However this may be we do not deem it necessary to go over the cases in an attempt either to reconcile or explain them. We rest our present decision on the fact that the conduct of vendor and vendee in this case justified the conclusion that they both assented to the rescission of the contract.

Upon the second point, as to the alleged equitable assignment of the funds in the bank against which the check was drawn by Brown, Bonnell & Company, and given to the Florence Mining Company, we do not think there can be any serious question of the correctness of the master's decision. The check was not drawn against any particular fund. There was, indeed, no fund out of which it could have been paid. There was only a little more than one-fifth of its amount on deposit at the time to the credit of the drawer. The notes

sent to the bank for discount at the time the check was given were never discounted, and were returned to the sender. They were not to be used for the payment of the check unless discounted.

An order to pay a particular sum out of a special fund cannot be treated as an equitable assignment *pro tanto* unless accompanied with such a relinquishment of control over the sum designated that the fund-holder can safely pay it, and be compelled to do so, though forbidden by the drawer. A general deposit in a bank is so much money to the depositor's credit; it is a debt to him by the bank, payable on demand to his order, not property capable of identification and specific appropriation. A check upon the bank in the usual form, not accepted or certified by its cashier to be good, does not constitute a transfer of any money to the credit of the holder; it is simply an order which may be countermanded, and payment forbidden, by the drawer at any time before it is actually cashed. It creates no lien on the money, which the holder can enforce against the bank. It does not of itself operate as an equitable assignment.

*Judgment affirmed.*

Mr. Justice Matthews did not sit in this case or take any part in the decision.