## LOVE vs ARDMORE STOCK EXCHANGE ET AL.

Opinion delivered October 19, 1904.

1. *Bank Check—Not an Equitable Assignment of Funds on Deposit—As Against Intervening Garnishment.*

> A check drawn in ordinary form on general funds in a bank does not, without notice to the bank and without presentation, operate as an equitable assignment of funds of equal amount of the drawer. And a garnishment served on bank before presentation of such check becomes a superior lien on such funds.

Appeal from the United States Court for the Southern District.

HOSEA TOWNSEND, Judge.

Action by L. H. Love against the Ardmore Stock Exchange and others. Judgment for defendants. Plaintiff appeals. Reversed.

January 23, 1899, appellant, L. H. Love, began his action for debt, and filed in the office of the United States commissioner, Southern District, at Ardmore, complaint and affidavit for attachment against the Ardmore Stock Exchange, without alleging whether defendant was a corporation or a partnership.   Attachment bond, in due form on same day was also filed and approved February 2, 1899, the commissioner allowed plaintiff, by interlineation, to amend the affidavit showing that defendant is composed of W. D. Peak and John S. O'Mealy.   Judgment before the commissioner was obtained February 8, 1899, in favor of plaintiff, Love, against defendants Peak and O'Mealy, composing the Ardmore Stock Exchange, for $300, besides interest upon the demand, sustaining the attachment, and fixing the liability of the First National Bank of Ardmore, Ind. Ter., as garnishee, at $346.46, and directing the garnishee to pay amount of judgment and costs against defendants into court, and judgment that W. P. Poland recover nothing by reason of his interplea.   From this judgment, Poland appealed to the United States Court, Southern District, at Ardmore, where and before whom on the 16th day of February, 1901, a trial de novo was had, resulting in a judgment in favor of L. H. Love, appellant, against Ardmore Stock Exchange and W. D. Peak for $300, principal, and interest from January 23, 1899, at the rate of 6 per cnt. per annum, and all costs except the cost of prosecuting and defending the interplea of W. P. Poland, which was adjudged against plaintiff; and judgment in favor of Poland, interpleader, that he is entitled to the money in hands of the garnishee to credit of John S. O'Mealy, manager, and directing the garnishee to pay the money to the interpleader, to which judgment appellant duly excepted.   The court below found his conclusions of fact separately from his conclusions of law, and, as there is no controversy as to the evidence, the conclusions of fact only need be considered.   They are, in substance, as follows:

"(1)   That on January 23, 1899, plaintiff filed suit in commissioner's court against the Ardmore Stock Exchange for $300, due upon open account, and at same time filed proper affidavits and bond, and caused order of attachment to issue against defendant, and writ of garnishment to issue, which was served upon the garnishee January 23, 1899; that the affidavit for attachment and garnishment, as originally filed, did not disclose the individual names of the Ardmore Stock Exchange, but on February 2, 1899, said affidavits were amended in the court below, alleging defendant is composed of W. D. Peak and Jno. S. O'Mealy; and that, on the day the judgment was rendered in the United States Court, plaintiff dismissed the cause as to Jno. S. O'Mealy, and amended the affidavits so as to show W. D. Peak alone composed the Ardmore Stock Exchange.

"(2)   I find from the evidence that at and prior to the filing of this suit the said W. D. Peak resided in Ft. Worth, Texas, and owned and run a business in Ardmore, known as the Ardmore Stock Exchange, with John S. O'Mealy as manager; that all dealings had with plaintiff were in the name of Ardmore Stock Exchange, with John S. O'Mealy as manager; and that plaintiff had no notice that Peak run said business in any other name.

"(3)   That defendant was indebted to the plaintiff upon open account on January 23, 1899, in the sum of three hundred dollars, exclusive of interest, and is entitled to judgment against defendant Ardmore Stock Exchange and W. D. Peak in the sum of three hundred dollars, with interest thereon from January 23, 1899, at the rate of six per cent. per annum, and that the attachment herein as against defendant must be sustained on the ground that W. D. Peak is a nonresident of the Indian Territory.

"(4)   I find that the money deposited in the bank in the name of John S. O'Mealy, manager, was deposited by W. D.

Peak, by O'Mealy as manager, and that O'Mealy made all deposits for Peak in said bank in his (O'Mealy's) name, as manager.

"(5) I find that the check which John S. O'Mealy, manager, gave to interpleader on the said bank, coupled with the agreement between the said O'Mealy and interpleader that the money in bank, and to be deposited therein, was for the benefit of the interpleader, together with all the circumstances attending the creation and delivery of said check, constituted an equitable assignment of the fund in bank as between the interpleader and O'Mealy and defendant, and as against the claim of L. H. Love as plaintiff in garnishment."

The check drawn by O'Mealy, as manager, upon the bank in favor of Poland, is as follows: "No. 5. Ardmore, I. T. Jany. 9, 1899. First National Bank, Ardmore, I. T. Pay to W. P. Poland or order Three hundred sixty-four 41-100 Dollars. $364.41. J. S. O'Mealy, Mgr. (2-cent revenue stamp canceled). 1—11—19. J. S. O'M." Indorsed, "W. P. Poland," and in lead pencil, "1—25—1899."

The court pronounced judgment upon its findings of fact as follows: "It is therefore considered, adjudged, and decreed by the court that the plaintiff, L. H. Love, do have and recover of the defendant Ardmore Stock Exchange and W. D. Peak the sum of three hundred dollars, principal, with interest thereon from January 23, 1899, at the rate of six per cent. per annum, together with all costs herein expended or incurred, except the costs of prosecuting and defending the interplea herein, for which plaintiff may have his execution, and that the attachment herein, as against said Ardmore Stock Exchange and W. D. Peak, be, and the same is hereby, sustained, but the attachment as to John S. O'Mealy be, and the same is hereby, dissolved. It is

further considered, adjudged, and decreed by the court that the interpleader, W. P. Poland, is entitled to the money on deposit in the First National Bank of Ardmore, Ind. Ter. (garnishee), to the credit of J. S. O'Mealy, manager, and said bank is directed to pay said money to said interpleader, and that the plaintiff, L. H. Love, recover nothing of the garnishee and interpleader by reason of this action, and that said garnishee and interpleader recover of the plaintiff all costs by them in their behalf expended or incurred, for which they may have their execution, to which judgment of the court the plaintiff, at the time of the rendition thereof, in open court, duly excepted, and still excepts."

Plaintiff filed his motion for a new trial, which was over-ruled by the court, exception duly taken, and the cause stands before this court upon appeal. The motion for new trial is as follows (caption omitted): "Now comes the plaintiff, and moves the court to set aside, vacate, and hold for naught the judgment rendered herein, and grant him a new trial and as ground therefor he alleges: (1) The judgment of the court is contrary to law. (2) The judgment of the court is not supported by sufficient evidence, and is contrary to the evidence. (3) The court erred in holding that the giving of the check by John S. O'Mealy, manager, upon the First National Bank, in favor of W. P. Poland, the interpleader, with a secret agreement between O'Mealy and Poland that the money in, or to be deposited in, said bank to the credit of John S. O'Mealy, manager, without notice to plaintiff or the garnishee of such secret agreement, constituted an equitable assignment of said funds, binding in law upon plaintiff and garnishee."

*C. L. Herbert* and *H. M. Cannon,* for appellant.

*Potter & Potter,* for appellee.

GILL, J.    Appellant makes the third and last assignment of error in his motion for new trial as his specification of error

relied on in this court.   The case was tried in the court below without the intervention of a jury, and the court made its certain specified findings of fact from the testimony, and, among them, it found that the check which John S. O'Mealy gave to the interpleader on the garnishee bank was coupled with an agreement between said O'Mealy and the interpleader that the money in bank, and to be deposited therein, was for the benefit of the interpleader, and that, taken with all the circumstances attending the creation and delivery of said check, this constituted an equitable assignment of the fund in bank as between the interpleader and O'Mealy and defendant, and as against the claim of L. H. Love as plaintiff in the garnishment.   In the case at bar the intervener, Poland, had had transactions with the Ardmore Stock Exchange, composed, as the evidence showed, of one W. D. Peak, who resided in Ft. Worth, Tex., and that one J. S. O'Mealy managed the business of said firm at Ardmore in his own name as manager; that the intervener and sundry persons were dealing through said stock exchange in buying and selling futures of cotton and other products; that said W. D. Peak was indebted to plaintiff on account in the sum of $300; that said Peak was a nonresident of the Indian Territory; that, being so indebted to the plaintiff, he had said transactions with the intervener, and, in settlement of a certain transaction between Peak and intervener, Peak deposited to his general bank account, in the ordinary way of closing such transactions, certain moneys in bank, and, through his manager, had advised the intervener that he had so deposited such money, and gave to the intervener, through his said manager, a check to the amount of $364.40 on the 9th day of January, 1899; that the intervener, instead of presenting said check for payment, and without notifying the bank, held it for two weeks before presenting it for payment, presenting it first on the 25th day of January, 1899, and two days after the attachment had been run and the bank garnished; that the amount in said bank to the credit of Peak stood in the name of

O'Mealy as manager, and did not equal the sum named in the check given at the time of its presentment, but that intervener offered to accept same in full payment of the check.

We have examined with care the opinion in Bank vs Yardley, 165 U. S. 634, 17 Sup. Ct. 439, 41 L. Ed. 855. In the Yardley Case the Fourth Street National Bank advanced $25,000 to the Keystone National Bank to enable it to meet its debtor balance in a Philadelphia clearing house. The president of the latter bank represented to the officials of the Fourth Street Bank that his bank owed a balance at the clearing house, which it could not meet, because its funds were in the city of New York, and exhibited a memorandum showing a balance to the credit of the Keystone National Bank in the Tradesman's National Bank of New York, of about $27,000, stating that his bank wished to draw against it and get clearing house certificates, and asked the Fourth Street Bank to accept the draft of the Keystone Bank for $25,000 against this reserve account in the New York bank. Relying upon these representations and statements, supported by the memorandum that the Keystone Bank had in the New York bank the specified fund against which it proposed to draw, the Fourth Street Bank gave to the president of the Keystone Bank, for its present use, clearing house gold certificates to the amount of $25,000, and took its draft. The books of the Keystone Bank show that on March 19, 1891, it had to its credit in the Tradesman's Bank of New York the sum of $26,907.32, and on that day an entry was made in said books charging against that credit the said draft of $25,000 it had given to the Fourth Street National Bank. This draft for $25,000 was forwarded to New York for collection, and presented for payment to the Tradesman's National Bank on the morning of March 20, 1891. Payment thereof was refused upon the ground that the drawee had not in hand funds of the drawer sufficient to pay the same. In fact, the Tradesman's Bank had in cash and collection items

for the Keystone Bank the sum of $26,907.32. On March 20, 1891, by order of the Comptroller of Currency of the United States, the Keystone National Bank was closed, and thereafter Robert M. Yardley was appointed receiver thereof. After this the money in the Tradesman's National Bank of New York to the credit of the Keystone National Bank was paid over to Robert M. Yardley, who received out of the cash and collection items the sum of $25,825.62. The case at bar is altogether different from the Yardley Case, in this: That the transaction between the Ardmore Stock Exchange and W. P. Poland, the interpleader, at the time the check was given, and for which it was given, was wholly past, and the check was not given for an inducing, present consideration passing between the parties. Interpleader took the check, and held it for many days without presentation, and without notifying the bank on whom the check was drawn, in any way, that he had such check. No sufficient amount of funds to meet the check was on deposit in the bank at the time the check was given. Interpleader accepted such check, relying upon representations of its maker that he would have funds on hand in bank sufficient to meet it when the same should be presented. The check was given against the general account of its maker, which account was at sundry times after giving said check, and before its presentation to the bank, checked against by its maker; and the fund in the hands of the bank had been attached, and the bank garnished, prior to its presentation. In the Yardley Case the assignee of the drawing bank sought to claim the fund checked upon as general assets of the drawing bank, and the Supreme Court held that the funds on deposit by the checking bank belonged to the payee bank by virtue of an equitable assignment.

It may be well, in this connection, to examine the circumstances of the giving of the check. John O'Mealy testified in the case as follows: "Q. Do you recollect of giving a check

to W. P. Poland on the 9th day of January, 1899, for about $364? A. I do. Q. For what was that check given? A. For the balance due him at the time from W. D. Peak & Co. Q. At the time the check was given, did W. D. Peak & Co. have the money in the bank to pay the check? A. Yes, sir. Q. How long had it been there? A. About an hour. Q. Had you placed the money in the bank about an hour before the check was given, or had you merely given a call for the money to the bank on the Ft. Worth Bank, or Peak's bank? A. I made a call on W. D. Peak & Co. They had the money wired to this bank at Ardmore—the First National Bank—by the First National Bank of Ft. Worth. Q. Did you call for all the money necessary to pay the Poland check, or did W. D. Peak & Co. have any part of it with the bank at the time? 'A. A hundred dollars of this amount was deposited that day as margin on a trade. The balance of $265 was wired to the bank here at my request. Q. For what purpose did you have that money sent to the bank at Ardmore? A. For the purpose of paying W. P. Poland the amount due him. Q. Did you intend, when that money was placed in the bank at Ardmore, to use it, or to draw against it for another purpose than the payment of the Poland check? A. I did not. Q. Did W. D. Peak & Co. know, when they sent the money from Ft. Worth, for what purpose it was to be used? A. I stated to them, in my call for the money, that it was to be paid to the party who had closed out his trade the day before, which is, I believe, the day that Poland closed out the trade. Q. Did you inform them of what customer had closed out his deal, or just a customer had closed out his deal? A. Mr. Poland's name was not mentioned to W. D. Peak & Co. I referred only to the trade which had just been closed out. Q. Did W. D. Peak & Co. afterwards use the money which you say that was placed in the bank to pay the Poland check for any purpose, or did it remain there until the failure of W. D. Peak & Co? A. It was not used by W. D. Peak & Co. for any purpose. Q. Can

you explain how it is that your check to Poland was for $365 and the amount of money remaining in the bank to meet the check was less than the amount of the check?   A.   The account was overdrawn before the money to pay this check was deposited." Cross-examination:   "Q.   You issued this check to W. P. Poland?   A.   I did.   Q.   You have said that this deposit in the bank which is now in controversy was placed there for the special purpose of paying this check which was held by Mr. Poland? A.   I did.   Q.   Wasn't $100 of that amount the identical money paid to you on the 9th day of January, 1899, by T. A. Thurmond?   A. It was.   Q.   What was that $100 paid you by Mr. Thurmond for?   A.   As margin on a trade executed for him that day.   Q.   What was the consideration for the check given you as manager to W. P. Poland?   A.   For balance due Mr. Poland from W. D. Peak & Co.   Q.   What was that balance for? A.   It was margin which he had deposited to W. D. Peak & Co. and the profits accruing from a trade made through them. *   *   *   Q.   Mr. Poland, you are the interpleader in this case. are you?   A.   Yes, sir.   Q.   Did you have any business transactions with W. D. Peak & Co. during the fall and winter of 1898 and 1899?   A.   Yes, sir.   Q.   Do you recollect at what time you closed out with that concern?   A.   I think it was on the 10th day of January.   Q.   1899?   A.   Yes, sir.   Q.   At the time you closed out with them, what amount did they owe you, if anything?   A.   They owed me three hundred and sixty-four dollars and forty-one cents.   *   *   *   Q.   Well, now, did you get a check on that day or the next day?   A.   I got it on the 11th day—banking day.   All the banks here, I understand, closed on the 11th.   That is the way I understand the stamp was canceled the 11th and my deal closed on the 10th.   I closed it just prior to twelve o'clock, and this check was given in the afternoon, so I suppose he canceled it on the banking day, as I understand they close their banking hours at twelve o'clock here.   Q.   Well, what is the reason he didn't give you the

check at the time you closed out your business—that he gave you that statement? A. He told me he didn't have any money here, and that Peak & Co. kept no money here, and that when the deal was closed out they had the bank here wire the bank, or rather wire Peak, to forward the money here, and I told him that was all right, and he told me he would give it to me in the afternoon. I was sick at the time, and went to my dinner, and remained there all that afternoon until about five o'clock, and I came up to the office, and there I found O'Mealy, and he said, 'I have got your money for you; it has been sent to the bank.' And so I left on that afternoon train—I think it left here then about 6 o'clock—and I went down to Texas, where my family was, and was sick as I told you, and I was in bed down there for a week or ten days, and I wasn't thinking about the check, and I put the check in my pocket and kept it. Q. What day did you ever present it, if you did present it, to the First National Bank of Ardmore for payment? A. On the 25th day of January, 1899. Q. Why wasn't it paid? A. Because Mr. Love had garnished the money as the Ardmore Stock Exchange, and they couldn't pay it. Q. Was there then in the bank a sufficient amount to pay your check? A. No, sir; not quite. Three hundred and forty-seven dollars in there, I think. Q. Did you offer to surrender the check for that amount of money? A. I did. Q. When you got back to Ardmore, had the stock exchange, or had W. D. Peak & Co., failed? A. Yes, sir; they had failed. I suppose they had failed. * * * Q. Was this check given on the day before or the day it was written? A. This check was given the day after it was written. I mean by that, he must have been mistaken. Q. He must have antedated the check? A. He must have done it. Q. I want to read the check. (Reading check heretofore referred to as Exhibit A). You didn't present that check to the First National Bank until after you had held it several weeks, did you? A. No, it wasn't two weeks. Q. Two weeks? A. It wasn't two

weeks. I got it on the 11th or 10th day, and I presented it on the 25th. Well, just two weeks; yes. Q. How long after this attachment suit with Mr. Love, before you presented the check for payment? A. I think it was the next day or two days afterwards, I am not sure. I came right up here when I found that Peak had failed. I think I got here the next day. Q. Did you ever notify the bank or any of its officials that you held this check, until after Peak & Bro. failed? A. Yes, sir; I wired them from Marshall, where I was, that I held the check. Q. What day did you wire them? A. I don't recollect, but it must have been on the 23d, but it may have been on the 22d. Whatever day they failed on, then is when I notified them. Q. That was after you were apprised of the failure? A. Yes, sir. Q. That was after this attachment and garnishment was rendered? A. I couldn't say. Q. The garnishment and attachment was rendered on the 23d of January, 1899. Can you state to the court that you advised them that you held this check on that bank before this garnishee was served upon the bank? A. That I held the check? Q. Can you state that you advised the bank that you held a check upon the bank prior to the service of the writ of garnishment upon the bank? A. Yes, sir; I held the check before then. Q. That isn't the question, but did you advise the bank that you held it prior to the time that this garnishment was rendered? A. I couldn't say. I don't know whether I did or not. Q. Don't you know as a fact that you didn't, Mr. Poland? A. I got an answer from the bank. I didn't know when I advised them, though, but they wired me back that Mr. Love had garnished the money—the Ardmore Stock Exchange. Q. In reply to your telegrams? A. Yes, sir."

The bank's statement of the account of John S. O'Mealy, manager, is as follows:

### Account Current.

J. S. O'Mealy, Mgr., with the First National ·Bank of Ardmore,
Ind. Ter. ·

Report promptly on your monthly account, in order that
errors, if any, may be rectified.

| 1899. | | | | 1899. | | |
|---|---|---|---|---|---|---|
| Jany | 9 | Balance overdraft $ 21 | 22 | Jany 12 | 375 | 00 |
| | 14 | | 5 | 14 | 200 | |
| | 14 | | 200 | 20 | 100 | |
| | 16 | | 5 | 21 | .135 | |
| | 17 | . | 17 80 | | | |
| | 21 | | 134 10 | | | |
| | 23 | | 79 42 | | | |
| | 27 | Balance (red ink) | 347 46 | | | |
| | | | 810 | | 810 | |

This statement shows that on the 12th day of January,
1899, there was a credit to the depositor of the difference between
$375 and $21.22, an overdraft existing on January 19, 1899.   It
shows that on the 14th day of January, 1899, there was a further
deposit of $200 and two checks paid to the amount of one of
$200 and the other of $5; that on the 16th of January another
check of $5 was paid; that on the 17th day of January another
check of $17.80 was given and paid; that on the 20th of January
a deposit of $100 was made; that on the 21st of January a
deposit of $135 was made, and on that day two checks were
given—one for $134.10, and the second for $79.42; and that on
the 27th day of January, a balance was due the depositor of
$347.46, which had so remained from the 23d day of January.
It would seem from the evidence that the check given to the
interpleader by the Ardmore Stock Exchange, or by J. S. O'Mealy,
manager of W. D. Peak & Co., was upon a general account on
deposit in the First National Bank of Ardmore; that between the
time of the giving of the check to the interpleader and the pres-
entation of the check some 14 days had elapsed, during which

period the money on deposit in the bank had varied from day to day as the business demands of the concern represented by O'Mealy had made deposits and drawn checks thereon; and that on January 23d—the date of the garnishment of the bank by the plaintiff—the general balance in favor of the depositor was $347.46. The funds in the bank garnished on January 23d were not the funds in bank on January 12th at all. If there was an equitable assignment of the balance in bank on January 12th, the funds in bank January 23d were not the funds assigned at all, because on January 12th the balance in favor of the depositor was only $343.78, and this was all that could possibly have been assigned. The depositor checked out of bank by January 23d the sum of $410.32, being all of this fund claimed to have been assigned, as well as other funds.

It is our opinion that the case at bar presents an altogether different question from the question so ably decided in the Fourt Street Bank vs Yardley, supra, or any of the cases cited in the opinion of said court. It is certainly true that at any time during the two weeks intervening between the delivery of the check to the intervener and its presentment that O'Mealy could have checked against this fund, and his check been honored; and in fact the testimony shows that he did check against his account in said bank during this time. It is a general rule of law that a check is not intended for acceptance, but for prompt presentment and payment; and it is the further rule that the check must be presented within a reasonable time after receiving it. Benjamine's Chalmer's Dig. arts. 256, 257. In the Yardley Case the payee bank forwarded the check made immediately upon its receipt for payment. In the case at bar the intervener, by his own statement, allowed 14 days to elapse before presenting his check for payment, and only presented said check for payment upon learning of the impending failure of the maker thereof, and after an attachment had been run against the general

funds of the maker on deposit in the bank. Mr. Justice White, in his opinion in the Yardley Case, supra, says: "As between a checkholder and a bank upon which such check is drawn, it is settled that, unless the check be accepted by the bank, an action cannot be maintained by the holder against the bank;" citing Bank of Republic vs Millard, 10 Wall. 152, 19 L. Ed. 897; First National Bank vs Whitman, 94 U. S. 347, 24 L. Ed. 229. And he further says: "It is also settled that a check drawn in the ordinary form does not, as between the maker and payee, constitute an equitable assignment pro tanto of an indebtedness owing by the bank upon which the check has been drawn, and that the mere giving and receipt of the check does not entitle the holder to priority over general creditors in a fund received from such bank by an assignee under a general assignment made by the debtor for the benefit of his creditors;" citing Florence Mining Co. vs Brown, 124 U. S. 385, 8 Sup. Ct. 531, 31 L. Ed. 424, and Laclede Bank vs Schuler, 120 U. S. 511, 7 Sup. Ct. 644, 30 L. Ed. 704. And he further says that: "Whilst an equitable assignment or lien will not arise against a deposit account solely by reason of a check drawn against the same, yet the authorities establish that if, in the transaction connected with the delivery of the check, it was the understanding and agreement of the parties that an advance about to be made should be a charge on and be satisfied out of a specified sum, a court of equity will lend its aid to carry such agreement into effect as against the drawer of the check, mere volunteers, and parties charged with notice." By the expression "mere volunteers," used by the court, can only be meant one who has received something from the debtor without consideration therefor. It cannot certainly be successfully contended that an attaching creditor undertaking to secure a valid subsisting indebtedness is a volunteer in the sense used by the learned judge.

An examination of the authorities shows that there is considerable conflict in the decisions, even where no attaching

creditor has intervened, as to whether a check drawn in the ordinary form would constitute an equitable assignment or not; and, except in one case—that of the National Bank of America vs Indiana Banking Co., 114 Ill. 483, 2 N. E. 401—which has been called to the attention of the court, where an attaching creditor has intervened, is it held that a prior unaccepted check acts as an equitable assignment upon a general account of a depositor in bank. The general rule is, and the concensus of authorities holds, that checks drawn in the ordinary form, not describing any particular fund, or using any words of transfer of the whole or any part of the account standing to the credit of the drawer, but containing only the request directed to the bank to pay to the order of a payee a certain sum of money, are not, in the absence of acceptance, an assignment of the funds of the drawer. National Bank of the Republic vs Millard, 10 Wall. 152, 19 L. Ed. 897; Florence Mining Co. vs Brown, 124 U. S. 385, 8 Sup. Ct. 531, 31 L. Ed. 424; and a long line of cases cited in the American Digest (Cent. Ed.) vol. 4, cols. 1247, 1248. The federal courts hold that a check operates as an equitable assignment pro tanto as between the holder and the assignee in insolency of the drawer, where it is made and delivered prior to the assignment, and not presented for payment until after the drawee is notified of the assignment by the assignee. German Savings Inst. vs Adae (C. C.) 8 Fed. 106. But where some particular creditor attached funds in the general bank account of such maker the concensus of authorities seems to hold that the attachment lien takes priority over a check given against such general fund. In Pennsylvania it is held: "On an attachment against B., A. issued execution against C. Bank, as garnishee of a fund on deposit belonging to B. Previously to this B. had given to· D. a check upon the bank, of which the bank had no notice at the time the attachment was served on it, and which was not presented until after the attachment. The court held that the check did not operate as an assignment of the fund in the hands

of the bank and that D., the payee, had no claim or lien upon said funds." Kuhn vs Warren Savings Bank, 11 Atl. 440. And to like effect it was held in New York: "Where the balance due a depositor in a bank, is levied upon under an attachment against the depositor the bank is not authorized to deduct an outstanding check given by the depositor to a third person, and which had not, prior to the levy of the attachment, been presented and accepted, since without such acceptance the check did not operate as an equitable assignment of the fund against which it was drawn." Duncan vs Berlin, 60 N. Y. 151. In Massachusetts it is held: "A bank check for more than the amount of the drawer's deposit does not operate as an assignment of the actual balance until the bank has agreed to pay the check pro tanto." Dana vs Third National Bank, 95 Mass. 445, 90 Am. Dec. 216. And to like effect is Bullard vs Randall, 67 Mass. 605, 61 Am. Dec. 433.

Upon the whole, a careful examination of the various decisions of the different courts upon this question of what constitutes an equitable assignment of the funds of a depositor in a bank, where the depositor has given a check on such fund, we are forced to the conclusion that before a check on such funds would become an equitable assignment thereof, in a case where attaching creditors have reached such funds, one of three things must appear: First, the check must, on its face, show the intention to appropriate the fund on deposit; or, second, the depository bank must have had notice in some way of the drawing of such check; or, third, the check must have been made against a particular fund on deposit, and for the whole of such fund— neither of which conditions appear in the evidence or in the findings of fact by the court in the case at bar. We are of the opinion that, where a party has a check in ordinary form on general funds in bank, it is his duty to present such check within a reasonable time, and if, before presentation of his check, a

third party has attached or garnished the moneys in proper legal action, that the payee of the check must stand the consequences of his failure to get his claim in in time for payment.  Shinn on Attachment & Garnishment, vol. 2, § 582, and cases cited thereunder.

The judgment of the court was erroneous in adjudging that the intervener was entitled to the money on deposit in the garnishee bank, and in directing said bank to pay said money to the intervener, and that the plaintiff (appellant) recover nothing of the garnishee and interpleader, and awarding judgment for costs against appellant in the garnishment proceedings.  The judgment of the court below is reversed and remanded, with directions to proceed in a regular manner with the case in accordance with the views herein expressed.  Reversed and remanded.

RAYMOND, C. J., and CLAYTON, J., concur.