SCHALK CHEMICAL COMPANY, a Corporation, Gerald I. Farman, Hazel I. Farman, John Carver Baker and Patricia Baker, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 16702.

United States Court of Appeals Ninth Circuit.

May 21, 1962.

Rehearing Denied Aug. 7, 1962.

Donald Keith Hall, Los Angeles, Cal., for petitioners.

Charles K. Rice, Asst. Atty. Gen., Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Harry Baum, Arthur I. Gould, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before STEPHENS, BARNES and KOELSCH, Circuit Judges.

KOELSCH, Circuit Judge.

This is a petition to review a decision of the Tax Court of the United States sustaining the Commissioner's determination of deficiencies in income tax of Schalk Chemical Co., a California corporation, and Hazel I. Farman and Patricia Baker, two of its stockholders. The three cases were consolidated in the Tax Court for the purpose of trial. The opinion is reported in 32 T.C. 879 (1959).

On his death in 1928, Horace O. Smith, Sr., left surviving his widow, Hazel I. Smith (now Farman), three minor children, Evelyn Smith (now Marlow), Horace O. Smith, Jr., and Patricia Smith (now Baker), and his mother, Charlotte E. Wood. Part of his estate consisted of 100,000 shares of stock, comprising all the issued and outstanding stock of Schalk, a manufacturer of paint products, paint brush cleaners and sundry home repair items. During the course

of the probate proceedings, a dispute arose among Smith's legatees and heirs over the provisions of his will, and as the upshot of that matter the shares and certain other estate property were placed in a spendthrift trust for a term of twenty years commencing December 29, 1930. The trust agreement designated three persons to act successively as trustee or "supervisor"; it vested the trustee with the voting rights of all the shares of stock and made him sole manager of Schalk; it provided for the payment to Smith's widow of one-half the net income of the estate and the remainder in equal shares to his mother and children and further provided that at the end of the term the corpus was to be distributed to the income beneficiaries in like proportion.

Shortly after the trust was created, Smith's mother died and the three children succeeded to her interest. The first of the three named trustees declined to act, the second served until his death in 1943; and the third, Horace O. Smith, Jr., who by then had reached his majority, thereupon became trustee and succeeded to the position of manager. Almost at once the other beneficiaries and their husbands, particularly Gerald I. Farman, whom Mrs. Smith had married soon after the trust was created, began to offer Smith suggestions how he should conduct the business and demanded that he make numerous changes in its operation. But Smith declined to share his responsibility and rejected most of the advice the others gave; according to Mr. Farman, he "would not cooperate in any way with the other shareholders of Schalk. He wouldn't take advice." This led to considerable dissension between Smith and the other beneficiaries and in 1947 his two sisters commenced suit in

the Superior Court of Los Angeles County, California, seeking his removal. But that action was settled on January 15, 1948 and the suit dismissed. The terms of the settlement were embodied in a written contract entered into by all the beneficiaries of the trust. The settlement contract provided for the immediate resignation of Smith as trustee-supervisor and contained the further provision that he would sell and the others would purchase his interest in the trust for $45,000 payable $25,000 upon the signing of the contract and $20,000 upon delivery of the subject property. The initial amount, made up of $15,000 contributed by Mrs. Farman and $10,000 contributed by Baker and Marlow, was then paid; Smith resigned, and a new trustee was appointed.

A few days before the trust terminated on December 29, 1950, Farman, Baker and Marlow assigned the settlement contract to Schalk, and Schalk in turn assumed their remaining obligations to Smith and agreed to pay them $25,000 with interest. In February 1951, upon receipt of Smith's interest in the trust, Schalk fulfilled its agreement, paying Smith $20,000, Farman $15,000 plus $2,364.48 "interest" and Baker and Marlow each $5,000 plus $788.13 "interest".

In computing its taxable income Schalk deducted this entire amount as a business expense accrued in. 1950;[1] neither Farman nor Baker gave any effect to the portion she had received save for the interest which each reported as ordinary income.[2] However, the Commissioner, being of the opinion that none of the payments by Schalk was a business expense and that the whole amount including the $20,000 paid to Smith, constituted a dividend to Farman, Baker and Marlow,[3] disallowed Schalk's deduction

---

1. Section 23 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 23 reads in part as follows:
   "In computing net income there shall be allowed as deductions: (a) Expenses. (1) Trade or business expenses. (A) In general. All the ordinary and necessary expenses paid or incurred during the tax-able year in carrying on any trade or business * * *."

2. The record is silent as to Marlow; all that is apparent is that she is not involved in this proceeding.

3. Section 115(a) of the Internal Revenue Code of 1939 defines a dividend as "any

and increased the taxable income of Farman and Baker accordingly; he then determined the deficiencies which are the subject of this review.[4]

■ Petitioners' premise is that the settlement contract is divisible and in fact comprised two separate agreements, one consisting of a contract for Smith's resignation as trustee-supervisor in return for $25,000 and the other a contract for the purchase and sale of his interest in the trust for a consideration of $20,000.

On this assumption petitioners assert that when Farman, Baker and Marlow paid Smith to resign as trustee they did so to protect Schalk and keep it from failing; that the transaction imposed a moral obligation upon the corporation to reimburse them which it assumed and met after being freed from Smith's control. On this basis petitioners argue that the cost of Smith's removal was within the category of an ordinary and necessary business expense of Schalk and although initially paid by Farman, Baker and Marlow, should be viewed for tax purposes as if Schalk had made the payment with borrowed funds and thereafter repaid the lenders.

Consistent with their position that the $20,000 was the purchase price of Smith's interest, the petitioners conceded in the Tax Court that the Commissioner rightly disallowed that portion of the $45,000 claimed by Schalk as a business expense. However, they argue that the payment to Smith was not a dividend to Farman, Baker and Marlow. They acknowledge that the settlement contract contains what appears to be the agreement of Farman, Baker and Marlow to buy Smith's interest and they also recognize that a dividend may take many forms including the payment or satisfaction at the direction of a stockholder of his obligation to a third person as well as a distribution directly to him;[5] but they argue that (1) the settlement contract as a matter of law did not impose an obligation upon Farman, Baker and Marlow to purchase Smith's interest and (2) that even if such an obligation arose, Farman, Baker and Marlow derived no taxable economic benefit from the payment.

The first of the two grounds is based upon the fact that at the time the settlement contract was entered into the property Smith agreed to sell was part of the corpus of a spendthrift trust created and existing under the laws of California. "The general doctrine that spendthrift trusts, inalienable by the beneficiary and inaccessible to his creditors during his life or for a term of years in th[at] state is well established." McColgan v. Walter Magee, Inc., 172 Cal. 182, 155 P. 995 (1916). As a corollary the California court later held in Kelly v. Kelly, 11 Cal. 2d 356, 79 P.2d 1059, 119 A.L.R. 71

distribution made by a corporation through its shareholders, whether in money or in other property, * * * out of its earnings and profits accumulated after February 28, 1913." 26 U.S.C.A. § 115(a) (1939 ed.).

4. In the case of Baker, the Commissioner also made two other adjustments. Their validity is conceded by the taxpayer; but the amount of the resulting tax increase is relatively small and the general three-year statute of limitations provided by section 275(a) bars a deficiency assessment based upon them unless the $5,000 which Baker received from Schalk is also taxable income; in the latter event, the otherwise tardy assessment is saved by section 275(c), which fixes a five-year limitation upon an assessment when the omission is in excess of 25% of the taxpayer's gross income stated in the return.

5. The rationale underlying the cases is well stated in Wall v. United States, 164 F.2d 462, 464 (4th Cir. 1947) as follows: "It cannot be questioned that the payment of a taxpayer's indebtedness by a third party pursuant to an agreement between them is income to the taxpayer. [Citations omitted.] The transaction is regarded as the same as if the money had been paid to the taxpayer and transmitted by him to the creditors; and so if a corporation, instead of paying a dividend to a stockholder, pays a debt for him out of its surplus, it is the same for tax purposes as if the corporation pays a dividend to a stockholder, and the stockholder then utilizes it to pay his debt."

(1938) that the assignee of the interest of the beneficiary in such a trust gains no right to the specific property and cannot secure the same by a decree of specific performance either against the trustee or against the beneficiary following distribution. From those decisions the petitioners reason that "[t]he other beneficiaries of the trust therefore, were not obligated to purchase the property distributed to Smith upon termination of the trust but had a possibility, if they or their assigns desired to do so, of acquiring such property, provided Smith survived termination of the trust and chose to comply with his promise. Such contingent right was less than an option, since the right could not be specifically enforced." [6]

The second ground urged by petitioners is exemplified in the cases of Fox v. Harrison, 145 F.2d 521 (7th Cir. 1944) and Decker v. Commissioner, 32 T.C. 326 (1959) aff'd per curiam 286 F.2d 427 (6th Cir. 1960).

In Fox v. Harrison, supra, the Court of Appeals sustained the District Court's finding that the purchase by a corporation from its only stockholder certain of his shares of stock was not "essentially equivalent to the distribution of a taxable dividend," under section 115 (g).[7] The taxpayer had initially purchased those particular shares from the only other stockholder when the latter had threatened to liquidate the corporation and the corporation had been unable to raise the necessary money to itself buy them. The District Court noted that Fox acquired the shares "on behalf of the corporation and as a temporary expedient" and the appellate court commented that "in reality, the involved stock was purchased by the corporation from Cross [the retiring shareholder]."

In Decker v. Commissioner, supra, five owners of all the stock of a corporation agreed that when any one of them died the survivors would purchase the decedent's shares from his estate. Two of the stockholders died and the other purchased the shares and immediately resold them to the corporation; the transaction was held not essentially equivalent to the distribution of a dividend under the circumstances. After carefully pointing out that the answer to the question of dividend equivalence depends upon a multitude of factors the importance of which may vary from case to case, the Tax Court found that the "net effect" of the particular transaction was the same as if the surviving stockholders had acted as agents of the corporation in making the agreement and purchasing the shares.

In the instant case petitioners' arguments demonstrate a high degree of ingenuity, but most of them are inapplicable if the findings of the Tax Court are consistent with the evidence.

The Tax Court announced as one of its factual conclusions that the settlement contract was a single and indivisible agreement. The language of the instrument itself impels that construction; it specifies that "the entire purchase price for the property agreed to be sold shall be the sum of $45,000 * * * and the sum of $25,000 paid by the Second Party

6. Petitioners cite as analogous Holsey v. Commissioner, 258 F.2d 865 (3rd Cir. 1958). There Holsey and another person owned all the outstanding shares of stock of a corporation. Holsey secured an option to purchase the others' shares at a price well below book value; the option was then assigned to and exercised by the corporation. The transaction was held not to be a constructive dividend to Holsey because there existed no obligation to discharge.

7. Section 115(g) of the Revenue Code of 1939 provides that:

"If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend."

**52**

as consideration to First Party for entering into this agreement shall * * * be applied toward said total purchase price." In addition, there was testimony that the $45,000 was not divisible but "was a lump sum of $45,000 * * * the amount which they were to pay him for stepping out of the picture and giving up his stock." Singleness of consideration strongly suggests an entire and unseverable contract. Dermott v. Jones, 64 U.S. 220, 16 L.Ed. 442 (1859); Schminke Milling Co. v. Diamond Bros., 99 F.2d 467 (8th Cir. 1938). Moreover, it appears that in the course of the negotiations leading up to that contract the parties exchanged a number of offers; it was initially proposed to Smith that he resign in return for $25,000 payable in installments, but he refused and declared that he would resign only if the others also agreed to purchase his interest; and there is testimony that the agreement was ultimately reached on that basis. "Whether a number of promises constitute one contract or more than one is to be determined by inquiring 'whether the parties assented to all the promises as a single whole, so that there would have been no bargain whatever, if any promise or set of promises were struck out.'" United States v. Bethlehem Steel Corp., 315 U.S. 289, 298, 62 S.Ct. 581, 86 L.Ed. 855 (1941).

The Tax Court also found that the other beneficiaries sought Smith's resignation primarily because they wanted to share in the management of the business; it further found the petitioners had failed to prove Smith's "management of the corporation was incompetent and that their action was either necessary or desirable to preserve its business." These findings, unfavorable to petitioners, are also appropriate to one version of the proof and are not so extravagant that they should be rejected as "clearly erroneous" on review.

Thus, even if in some way part of the consideration called for by the settlement could be allocated to the cost of Smith's removal the sum could not qualify as an ordinary and necessary business expense if paid by Schalk itself and the fact that others made the payment adds nothing to Schalk's claim; likewise since the payment was not beneficial to Schalk, no moral obligation to reimburse Farman, Baker and Marlow arose, there was no "debt" for it to assume and the "interest" it paid does not come within the purview of section 23(b) of the Internal Revenue Code of 1939 which permits as a deduction from gross income "interest paid or accrued within the taxable year on indebtedness." We conclude the Commissioner rightly disallowed Schalk's deduction.

The arguments of Farman and Baker are practically eviscerated by the impact of these findings; the situation of those taxpayers is essentially that of a stockholder who gains control of a corporation and uses its accumulated surplus to pay his personal debts. Their reliance on Fox v. Harrison and Decker v. Commissioner, supra, is misplaced, for in those cases the trier of fact had found—and the finding was sustained on review—that the corporate payments were for the benefit of the corporation and not the stockholders; here the finding is just the opposite—it was the shareholders and not the corporation [8] that derived

8. In Greenspon v. Commissioner, 229 F.2d 947 (8th Cir. 1956) part of the controversy centered upon certain corporate expenditures which had been treated as ordinary and necessary business expenses by Louis Greenspon, Inc. and its predecessor in returning its income. The Tax Court had held the expenditures were not ordinary and necessary but rather constituted constructive dividends to the controlling stockholder. In affirming, the Eighth Circuit very tersely declared:

"Since we are of the opinion that no error was committed by the Tax Court in determining that the farm expenses paid by the corporations were not ordinary and necessary business expenses, it was proper for the Tax Court to treat such payments made by the corporation as constructive dividends to Louis Greenspon." The facts in the opinion closely parallel those in the instant case; there the moneys were paid out by the corporation to make the stockholders' farm a "show-

the benefit of those payments. On these facts the "reimbursement" was a dividend.

 The remaining contention that Farman and Baker were not legally obligated to purchase Smith's interest because they could not secure specific performance of the settlement agreement against him also lacks merit. It overlooks the distinction that must be drawn between mutual promises sufficient to sustain a contract and mutuality as that term is used in the law of contracts relating to specific performance. "As the rule is generally stated, equity will decree the specific performance of a contract only in cases where there is a mutuality of obligation and of remedy." 49 Am.Jur. Specific Performance, sec. 34. Although as a matter of law a promise by a beneficiary of a spendthrift trust to assign his interest cannot be specifically enforced either against the trustee or the beneficiary, nevertheless such a promise if supported by a valid consideration will give rise to an action against the beneficiary for its breach. Kelly v. Kelly, supra. If that consideration takes the form of a reciprocal promise by the other party, then the beneficiary may likewise maintain an action against the other party should the latter breach his promise; a promise in return for a binding promise is obviously not open to any objection as to want of mutuality. T. W. Jenkins & Co. v. Anaheim Sugar Co., 247 F. 958, L.R.A.1918E, 293 (9th Cir. 1918). Smith's promise to sell and Farman, Baker and Marlow's promise to purchase were mutually reciprocal and binding. If Smith breached his promise when performance was due then he was liable in damages to Farman, Baker and Marlow (Kelly v. Kelly, supra) and conversely Farman, Baker and Marlow were likewise liable to Smith. Poultry Producers v. Barlow, 189 Cal. 278, 208 P. 93 (Cal.1922); O'Brien v. O'Brien, 197 Cal. 577, 241 P. 861 (Cal.1926); Alworth v. Seymour, 42 Minn. 526, 44 N.W. 1030 (Minn.1890); Reichert v. Pure Oil Co., 164 Minn. 252, 204 N.W. 882 (Minn. 1925); Rust v. Conrad, 47 Mich. 449, 11 N.W. 265 (Mich.1882).[9]

The decision of the Tax Court is affirmed.

---

place" and ostensibly provide the place and means to entertaining its prospective customers; here the payments enabled "stockholders" to accomplish a result which they personally desired but which was of dubious value to the corporation. The basis for the decisions in both cases is essentially the same: it was the stockholder personally who profited from the payment.

9. Payment of the balance of the purchase price and delivery of Smith's interest were concurrent conditions. Neither party, of course, could recover judgment for damages without establishing his own performance or offer to perform coupled with the ability to make such offer good if it was accepted. Florence Mining Co. v. Brown, 124 U.S. 385, 8 S.Ct. 531, 31 L.Ed. 424 (1888).