### FRED FLEMING v. THE STATE.

No. 1141. Decided June 23, 1911.

**1.—Illegal Deposit—Bank President—Statutes Construed.**

Under the Act of the Twenty-fifth Legislature, page 130, it is necessary that the indictment should charge the particular named officer with a violation of said statutes, and that such officer received or assented to receive a deposit of money or other valuable thing into the bank of which he is an officer, knowing at the time of the deposit that the bank was insolvent or

in failing circumstances, and that he either received this in person or assented thereto with the intention not to return the money.

**2.—Same—Indictment—Insolvency—Deposit.**

Where, in a prosecution of an illegal deposit in a bank, the indictment did not allege affirmatively that the bank was insolvent at the time of the reception of the deposit, and did not aver that the alleged check was in such condition as to become a deposit in the bank to the credit of the bank, or that it was transferred to the bank as a deposit, the same was insufficient. Qualifying Roby v. State, 41 Texas Crim. Rep., 152.   Prendergast, Judge, dissenting.

**3.—Same—Insolvency of Bank—Insufficiency of the Evidence.**

Where, upon trial for receiving an illegal deposit in a bank, the evidence showed that the bank was thoroughly investigated at the time of its alleged insolvency, and that the bank officers, directors and attorneys were all of the opinion that the bank was solvent under the law at the time of the alleged deposit, and that the bank was solvent from the standpoint of its assets in excess of its liabilities.   Held, that the State failed to prove insolvency of the bank.   Prendergast, Judge, expressing no opinion.

**4.—Same—Solvency—Evidence—Receiver—Insolvency.**

Where, upon trial of an illegal bank deposit, it was shown that the bank at the time of said deposit and at the time it closed its doors on the day alleged in the indictment was solvent, it was error to admit the testimony of the receiver long after said date as to the insolvency of said bank, and to admit in evidence his account of the condition of said bank, as this was not a criterion of its solvency.

**5.—Same—Charge of Court—Insolvency—Failing Circumstances—Cash Value.**

Upon trial of illegally receiving a bank deposit, a charge of the court, that a bank is not insolvent or not in failing circumstances if it has sufficient assets realizable in cash value to meet its liabilities as they fall due in the ordinary course of business, treating them as an ordinarily prudent person would ordinarily conduct his business, was reversible error.

**6.—Same—Solvency—Requested Charge.**

Upon trial of receiving an illegal bank deposit, it was reversible error not to submit a requested charge that if the jury had a reasonable doubt concerning the alleged bank, on the date of the alleged deposit, that it owned and held assets to pay its debts within a reasonable time, in the ordinary course of business under the conditions existing, then said bank was not insolvent or in failing circumstances within the meaning of the law.

**7.—Same—Charge of Court—Insolvency—Failing Circumstances.**

Where, upon trial for receiving an illegal bank deposit, the court's charge presented the wrong criterion and gave erroneous instructions as to what insolvency means, and as to what in failing circumstances mean, and that the requested instructions presented the better and sounder rule, which the court refused to submit, there was reversible error.

**8.—Same—Knowledge of Defendant—Insufficiency of the Evidence.**

Where, upon trial of receiving an illegal bank deposit, the evidence showed that the defendant knew nothing about said deposit and never heard of it until subsequent to the bank closing and after it had ceased to operate, the conviction could not be sustained.   Prendergast, Judge, expressing no opinion.

**9.—Same—Statutes Construed—Fraudulent Intent.**

In order to hold an officer of the bank criminally responsible under the law, there must be some evidence of fraud on his part, and in connection with the knowledge of the fact that the bank is insolvent there must be a purpose on his part in receiving deposits to place the depositor in such position that he would thereby lose his money; and the Act of the Legislature in order to make it consistent with our criminal jurisprudence must be so con-

strued, and words importing such construction must be read into said statutes. Prendergast, Judge, dissenting.

#### 10.—Same—Change of Venue—Prejudice.

Where, upon trial of receiving an illegal bank deposit, the evidence showed that the county of the prosecution was thoroughly canvassed by opposing candidates for office, and the matter of defendant's alleged dereliction was discussed from one end of said county to the other, and was made the turning point in said race for office, and whether defendant should be indicted, etc., a change of venue should have been granted.

Appeal from the Criminal District Court of Dallas. Tried below before the Hon. Robt. B. Seay.

Appeal from a conviction of illegally receiving a bank deposit; penalty, four years imprisonment in the penitentiary.

The opinion states the case.

*Lewis T. Carpenter* and *Crawford, Muse & Allen,* for appellants.— On question of change of venue: Randle v. State, 34 Texas Crim. Rep., 43, 28 S. W. Rep., 953; Nite v. State, 41 Texas Crim. Rep., 340; Faulkner v. State, 43 Texas Crim. Rep., 311.

On question of insufficiency of indictment: White v. State, 3 Texas Crim. App., 605; Gaddy v. State, 8 Texas Crim. App., 127; Vaughn v. State, 9 Texas Crim. App., 563; Kerry v. State, 17 Texas Crim. App., 178; McAfee v. State, 38 Texas Crim. Rep., 124.

On the question of the court's charge in defining insolvency and failing circumstances: Ellis v. State, 20 L. R. A., 444, N. S.; State v. Clements, 85 N. W. Rep., 229; Parrish v. Commonwealth, 123 S. W. Rep., 339; 37 Central Law Journal, p. 147.

On question of defendant's knowledge of the condition of the bank and court's charge thereon: Bell v. State, 20 Texas Crim. App., 445; Partillo v. State, 22 Texas Crim. App., 586; Cochran v. State, 28 Texas Crim. App., 422; Bonner v. State, 29 Texas Crim. App., 223; Gilcrease v. State, 33 Texas Crim. Rep., 619; Ex parte Smith, 111 Pac., 930.

*C. E. Lane,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—The article of the Penal Code under which appellant was indicted is the Act of the Twenty-fifth Legislature, found at page 130, and reads as follows:

"Be it enacted by the Legislature of the State of Texas: That if any president, director, manager, cashier or other officer, of any banking institution, or the owner, agent, or manager, of any private bank or banking institution, or the president, vice-president, secretary, treasurer, director, or agent, of any trust company or institution, doing business in this State, shall receive or assent to the reception of any deposit of money or other valuable thing into such bank or banking institution, or trust company or institution, or if any such officer, owner, or agent, of such bank or banking institution, or if any presi-

dent, vice-president, secretary, treasurer, director or agent, of such trust company or institution, shall create or assent to the creation of any debt, debts, or indebtedness, in consideration of or by reason of which indebtedness any money or valuable property shall be received into such bank or banking institution, or trust company or institution, after he shall have had knowledge of the fact that such bank, banking institution, or trust company or institution, or the owner or owners of any such private bank, is insolvent or in failing circumstances, he shall be deemed guilty of a felony, and upon conviction thereof shall be punished by confinement in the penitentiary for a term of not less than two nor more than ten years; provided, that the failure of any such bank or banking institution, or trust company or institution, shall be prima facie evidence of knowledge on the part of any such officer or person that the same was insolvent or in failing circumstances when the money or property was received on deposit."

Under this statute it is necessary that the indictment should charge the particular named officer with a violation of the statute, and that such officer shall receive or shall assent to the reception of a deposit of money or other valuable thing into the bank of which he is an officer, knowing at the time of the deposit that the bank was insolvent or in failing circumstances. In order to constitute an officer of the bank guilty under this law, it must be alleged and proved that the bank in which the deposit was received *was* at the time of the reception insolvent or in failing circumstances. It must be further alleged and proved that the accused *knew* that such bank *was* then insolvent or in failing circumstances. It must be further alleged and proved that the accused either in person received the deposit, or that he assented to its reception, with the full knowledge on his part that the bank was insolvent at the time of the reception. This statute carries with it the distinct idea that the reception of such deposit must be attended with such circumstances as indicate that the accused received the deposit when there was no intention to return the money, or for the purpose of placing the deposit in such condition that the depositor could not recover the deposited property. If the accused was not aware of the insolvency of the bank, or that it was in failing circumstances, he could not be brought within the purview of this statute. The bank, therefore, must be, first, insolvent or in failing circumstances, and, second, that the accused had knowledge of that condition of affairs. The statute carries the further idea that the deposit creates the relation of debtor and creditor. If this relation was not created so far as this indictment was concerned, then it could not be a deposit.

The indictment, omitting formal parts, charges that appellant was president of the Western Bank & Trust Company, "the same being then and there a corporation organized and incorporated under the laws of the State of Texas, to do, and then and there, amongst other things, doing a banking business in the aforesaid county and State of

Texas, and the said Fred Fleming as president of said company aforesaid, did then and there unlawfully receive and assent to the reception into the banking department of said Western Bank & Trust Company aforesaid, as a deposit, valuable property, to wit: A bank check on the Commonwealth National Bank of Dallas, Texas, in the sum of thirteen hundred and seventy-eight dollars and forty-seven cents ($1,378.47), payable to the order of Sides & McAlister, and made by Boedeker Mfg. Co. (meaning thereby Boedeker Manufacturing Company), by J. A. Smith, treasurer; said check having been then and there deposited as aforesaid by the said Sides & McAlister, by the said J. M. Sides of said firm; said check then and there so deposited being then and there of the value of thirteen hundred and seventy-eight dollars and forty-seven cents ($1,378.47); the said Fred Fleming, president of the said Western Bank & Trust Company as aforesaid, having assented to and received said check as aforesaid, and the value and amount thereof aforesaid, to be and it was then and there deposited to the cash and checking account of said firm of Sides & McAlister, in said company; that the said Fred Fleming as president aforesaid of the said Western Bank & Trust Company aforesaid, did unlawfully receive and assent to the reception into the banking department of said Western Bank & Trust Company said check as aforesaid, after said Western Bank & Trust Company was in failing circumstances and insolvent, and after he, the said Fred Fleming, as president aforesaid, knew that the said Western Bank & Trust Company was in failing circumstances and insolvent, and after the banking department of said Western Bank & Trust Company was in failing circumstances and insolvent, and after he, the said Fred Fleming, president aforesaid, knew that the said banking department of said Western Bank & Trust Company was in failing circumstances and insolvent, contrary," etc.

There was another similar count in the indictment also submitted to the jury, which we deem unnecessary to set out. This indictment was attacked upon various grounds, two of which we will notice: First, that it did not allege affirmatively that the bank was insolvent at the time of the reception of the deposit, and, second, that the allegations are not sufficient to show and do not aver that the check payable "to the order of Sides & McAlister" was in such condition as to become a deposit in the bank to their credit, and that under the allegations of the indictment said check was not transferred as a deposit to the bank. We are of opinion both propositions are sound. The indictment charges that appellant received the check "payable to the order of Sides & McAlister" *after* said bank was in failing circumstances and insolvent. This is not an allegation that the bank was at the time insolvent, nor is there any allegation that the bank was then insolvent. The reception and deposit *"after"* a bank is insolvent or in failing circumstances is not an allegation that the bank was

insolvent at the time of its reception. Under the statute and the authorities relating to similar statutes, in other states as well as in Texas, to constitute the offense sought to be charged, it is essential that the banking institution be in failing circumstances and insolvent at the very time the deposit is received, and that the person sought to be held amenable must have knowledge of the fact that the bank was then insolvent and in failing circumstances when he assented to or received the deposit. It was contended by the State that this indictment follows that in the Roby case, 41 Texas Crim. Rep., 152, and reference is made to that case as authority for upholding this indictment. That contention is not correct. The indictment in the Roby case was held to be vicious, the judgment was reversed and the prosecution dismissed, because the indictment was not sufficient; but the opinion in that case did not discuss the question here raised. An inspection of the opinion will show these particular matters were not referred to nor discussed. It will be understood by the bench and the profession—at least ought to be—that a case is authority only on questions discussed and decided. An inspection of the authorities where such indictments are set out, framed under similar statutes, will show that the defects here pointed out were not to be found in the indictments in those cases. In fact, so far as we have been able to ascertain, in the time we have been able to look up the matter, all of those cases contain specific allegations that the bank *was insolvent at the time the accused received or assented to the reception of the deposit.* See Parrish v. Com., 123 S. W. Rep., 339; State v. Wells, 35 S. W. Rep., 615.

It is a rule in criminal pleading, not only so under criminal law generally, but expressly so under our statute, that everything should be stated in an indictment which is necessary to be proved, but that which is not necessary to be proved need not be stated. See Code of Criminal Procedure, article 440. It is laid down by Mr. Bishop that "the omission of any fact or circumstance to the constitution of the offense—in other words, made by law essential to the punishment— renders the indictment bad." 2 Bish., Crim. Proc., 3d ed., sec. 325. It has been held in this State that an indictment must set forth by proper and certain averments all the facts necessary to constitute a complete offense. Vaughn v. State, 9 Texas Crim. App., 563; Gaddy v. State, 8 Texas Crim. App., 127; White v. State, 3 Texas Crim. App., 605.

In Kerry v. State, 17 Texas Crim. App., 178, it was said that, "in setting out a statute offense, it is in general sufficient to describe it in the very words of the statute, because ordinarily no allegation of anything more than the words of the statute necessarily import is required in order to show that the statute offense has been committed by the defendant. But there are many exceptions to this general rule. As, for instance, if extrinsic facts be necessary to bring the act within the statute, they must be averred. And if a penalty be denounced for the commission or omission of an act under certain circumstances,

the indictment must charge the commission or omission under the circumstances specified."

The same rule was laid down and elaborated in White v. State, 3 Texas Crim. Rep., 605. In Burch v. Republic, 1 Texas, 607, the Supreme Court said: "Where general expressions are used in the statute, it is not enough to employ those general words only, but the facts intended to be included and forbidden by them must also be specified."

It was said in McAfee v. State, 38 Texas Crim. Rep., 124; "Our Constitution and laws provide that all indictments shall contain the nature and cause of the accusation against the accused; and, unless the statute contain, in its phraseology, all of the essential elements of the offense, it is not sufficient merely to follow the language of the offense. The rule that, to follow the language of the statute is sufficient, only applies to offenses which are complete within themselves when the acts set out in the statute are done and performed."

A test often applied by this court, and it seems to be a rule of universal application when speaking of the sufficiency of an allegation in an indictment, is this: "Every allegation in the indictment may be taken as true, and yet the defendant be guilty of no offense, then it is insufficient, although in the very words of the statute." See cases already cited.

Therefore, with reference to this phase of the indictment, we are of opinion it is insufficient. In other words, we are of opinion that there must be a direct and affirmative allegation that, at the time the deposit was said to have been received, *that the bank was then and there insolvent or in failing circumstances.*

Now, as to the second proposition, which is stated above, as follows, that the allegations were not sufficient to show that the check payable to the order of Sides & McAlister was in such condition as to become a deposit in the bank to their credit, it will be noticed that the indictment only avers that Sides & McAlister had been given a check payable to their *"order"* by Boedeker Manufacturing Company, and that said check had been deposited with the bank "to the cash and checking account of said Sides & McAlister." Does the mere placing in the bank a check payable "to the order" of the payee, unendorsed by the payee, render such a check cash, or a deposit to be treated as cash? We are of opinion this question should be answered in the negative. The bank did not thereby become the owner. It could not collect the check from the Commonwealth Bank, to which it was directed. The Commonwealth National· Bank could not be required to pay it, and would not, as a business concern, honor it for payment. The Western Bank & Trust Company, which was the bank of deposit, did not become the owner of the check, nor was it authorized legally to dispose of it in any way. It remained the property of Sides & McAlister. There is no allegation to the effect that the check was endorsed by Sides & McAlister, and there is nothing alleged which invested the bank with authority to control or even to collect it. It was simply an

allegation of the deposit of an unendorsed check, and with the further statement that said unendorsed check was passed to the cash and checking account of Sides & McAlister. Deposits are general or special, and are legally general deposits, unless otherwise agreed between the parties. Brahm v. Adkins, 77 Ill., 263.

In the 3d volume of Ency. of United States Supreme Court Reports, at page 9, this language is found: "A general deposit in a bank is so much money to the depositor's credit; it is a debt to him from the bank, payable on demand to his order, not property capable of identification and specific appropriation," citing Florence Mining Co. v. Brown, 124 U. S., 385; Manhattan Co. v. Blake, 148 U. S., 412.

This check, as plead in the indictment, was evidently not a deposit, nor did it come within either class of deposits. It could not be treated as a debt from the bank to Sides & McAlister, because it was anendorsed, and therefore remained the property of Sides & McAlister. This allegation, therefore, is not sufficient to show the title had passed from the payee to the bank. It is necessary, in order to constitute a deposit, that the title of the property pass to the bank. Lloyd v. West Branch Bank, 15 Pa., 172; People v. Dederick, 54 N. Y. Sup., 519; Bank v. Dean, 60 Pac. Rep., 226. We believe it to be a universal rule that, where a check is payable to order, it must be endorsed in order to pass the title.

Daniel on Negotiable Instruments, secs. 664a and 741. Section 664a, supra, reads as follows: "When the instrument is made payable to 'order,' the indorsement of the payee is necessary to transfer the legal title; and the transferee, without indorsement, takes it as a mere chose in action, and must aver and prove the consideration." The text cites in support of the above question, Hopkirk v. Page, 2 Brock., 20; Instone v. Williamson, 2 Bibb., 83; Russell v. Swan, 16 Mass., 314; Blakely v. Grant, 6 Mass., 385. See sec. 741, et seq.; Quigley v. Mexico So. Bank, 80 Mo., 289, citing the text; Sibley v. American Exchange National Bank, 97 Ga., 126, 25 S. E., 470; Haug v. Riley, Adm'r, 101 Ga., 372, 29 S. E., 44, approving text; Central City Bank v. Rice, 44 Nebr., 594; State v. Stebbins, 132 Mo., 332, 33 S. W., 1147, citing text; Everett v. Tidball, 34 Nebr., 803, 52 N. W., 816.

Section 741, supra, is thus quoted: "We have already seen that where a bill or note payable 'to order' is transferred without indorsement, the transferee does not acquire the legal, but only the equitable title. The holder under such a transfer must aver and prove the assignment, for the mere possession of the instrument unindorsed is not evidence of ownership, and its exhibition in a suit not sufficient ground of recovery." Haug v. Riley, Adm'r, 101 Ga., 372, 29 S. E., 44, quoting and approving text; May v. Dyer, 57 Ark., 441, 21 S. W., 1064, citing text; Hull v. Conover, 35 Ind., 372; Prescott v. Hull, 17 Johns., 284; Van Eman v. Stanchfield, 10 Minn., 255.

See chapter XX, on Presentment for Payment, sec. 1, sec. 573, et seq.; Beard v. First Nat. Bank, 39 Minn., 546; Gano v. McCarthy, 79 Ky., 409; Currie v. Borwan, 25 Oreg., 364, 35 Pac., 848; Bank v. Durfee, 118 Mo. 431, 24 S. W., 133, 40 Am. St. Rep., 396.

Again referring to the indictment, it will be noted that there is no averment that the check was ever endorsed by Sides & McAlister, or that it ever became the property of the bank. The pleader undertook to aver that the leaving of the check at the bank gave Sides & McAlister the right to draw against it. In other words, it was placed to their "cash and checking account." This is not an allegation that the transfer of the title was made, or that the check became the property of Sides & McAlister, nor is it an allegation that the check became the property of the bank. It was said in 5 Cyc., p. 494, that the depositor may part title with his paper at the time of depositing it by satisfactory agreement or by endorsing in blank, and cites cases in note 17 sustaining that proposition, but this being a general deposit, and not sought to be alleged to be a special deposit, therefore the facts and circumstances must be alleged if the purpose of the pleader was to show that it was a special deposit. A depositor may transfer such papers specially to the bank by making it payable to that bank, but there must be an endorsement to transfer the title in the check, and without endorsement the check remains the property of the payee in the check.

At page 293 of 3d volume of Ency. of United States Supreme Court Reports, it is said: "Where paper is payable to a person or order, or when, so payable, and specially indorsed, indorsement is necessary in order to entitle the transferee to sue thereon in his own name," citing Trust Co. v. National Bank, 101 U. S., 68, and Waters v. Millar, 1 Dall., 369. So the authorities sustain the proposition that the indictment wholly fails to allege or show a transfer of the title to the Sides & McAlister check to the bank. They are more than fully sufficient to show that the bank could not sue on the check, and they are fully as ample to demonstrate that the check remained the property of Sides & McAlister. We would supplement this with the further proposition found at page 48 of volume 3 of Ency. of United States Supreme Court Reports, as follows: "When negotiable paper is deposited for collection, the depositor remains the owner, as to the collecting bank, in the absence of special agreement. And the mere provisional credit as cash, with liberty to draw thereon, will not change the rule." Railway v. Johnston, 133 U. S., 566.

So it will be seen that the indictment does not charge the ownership of the check in the bank; it does not show a transfer of title to the bank, and therefore it could not be a deposit within the meaning of that term. It does not allege any special agreement or arrangement between the parties by which it became the property of the bank, therefore the mere fact that it was passed to the "cash and credit account of Sides & McAlister" would not change the rule of ownership.

It would be a question of fact rather than one of law, and this being true, a necessary allegation of special agreement would have to be set out in the indictment in order to admit proof of the fact that it was a special agreement. We are, therefore, of opinion that under the two propositions mentioned this indictment is deficient.

One of the most serious questions in the case, perhaps the most vital, is the solvency or the insolvency of the bank at the time of the alleged deposit, to wit, on the 14th day of January, 1908. We do not purpose to go into a detailed statement of the facts. This record contains something like 1,600 pages of printed matter. The bills of exception are numerous, and prepared with great skill and ability, presenting the different legal propositions relied upon with accuracy and care. We shall try to summarize the propositions.

It is contended that the bank was not only not shown to be insolvent, but in fact that it was solvent. McBride testified for the State as to the assets of the bank when he made his report, which was filed February 7, 1908, stating that the assets of the bank were $1,422,282.55, as he gathered from the books. He also stated that the liabilities amounted to $1,054,104.53. This was the State's showing as to the condition of the bank at the time Mr. McBride, the receiver, made his report on 7th of February, after the bank closed its doors on the 15th of the preceding January.

The witnesses Noble, Goodwin, Townsend and Templeton, as well as appellant, testified that during the months of November and December, 1907, some of them being officially connected with the bank, they went over all bills payable and receivable of the Western Bank & Trust Company, and after a careful review of all the bank papers, credits and debits, were of the opinion that the assets of the bank were not only sufficient to pay all liabilities, but that the value of the stock after paying all liabilities, was worth from twenty to sixty cents on the dollar. They differed among themselves as to the value of the stock, but none of them placed it below twenty cents on the dollar, and none of them placed it beyond sixty cents on the dollar. All of the witnesses advised appellant that the bank was solvent at the time that the assets were checked up. They arrived at this by placing them in three columns, respectively: In the first column they placed all of the assets that were regarded as good; in the second column they placed all of the assets they regarded as doubtful, and in the third column they placed those that they regarded as indifferent. After the assets were thus checked there was no material change, if any at all, made in the assets of the bank up to the time it closed its doors on the 15th day of January, 1908. Hence, if the bank was solvent at the time the assets and liabilities were so checked up in November and December, 1907, then the bank was solvent at the time it closed its doors on January 15, 1908. The testimony of the above-named witnesses, if true, clearly proved that the bank was solvent at the time the deposit was received on January 14, 1908. The evidence offered

by the State to establish the insolvency of the bank was that of the witness L. C. McBride, with reference to what the books disclosed as shown by his report as receiver, made to the District Court of the Forty-fourth Judicial District of Dallas County a number of weeks after the banks closed its doors. We would say here that the books themselves were not introduced in evidence, and testimony of the witness McBride as to what his receiver's report showed the assets and liabilities of the bank to be was all admitted over objection and exception of the appellant. This should not have been admitted for the reason that it was not the best evidence, and for the further reason that the receiver's report was largely prepared by bookkeepers of the witness McBride, and were hearsay so far as the witness McBride was concerned. Excluding the testimony of McBride because it was illegal and inadmissible, then all the testimony in the record clearly shows that the bank was solvent. But even if the evidence of McBride be taken, illegal and inadmissible as it was, we are of opinion that the summary of it quoted above, as stated by him in his report and as testified by him before the jury, showed the bank had an excess of assets above that of liabilities of something over $368,000.00. On the facts, we are of opinion that the bank was solvent on the 14th day of January, 1908.

It may be stated also in this connection, as amply shown, that these matters all occurred during the panic that was on the country and on the commercial and financial interests of the country during the fall of 1907 and the spring of 1908.

Another thing in this connection may be also mentioned: Fleming, as president of the bank, realizing the strenuous financial condition of things, and that the banks everywhere were refusing to pay out cash except in limited quantities, undertook to make arrangements to meet emergencies and keep his bank in condition to meet drafts, checks and matters of that sort. Looking to this, he had consummated arrangements through the clearing house at Dallas where he was to secure something like a quarter of a million dollars for the purpose above indicated, and had made what was thought to be complete and ample arrangements with the clearing house. Among other things, he purposed to put under mortgage the property of himself and wife, amounting according to his calculations, free of encumbrance, to something like a half million dollars, consisting of over 72,000 acres of land, valued at from $7.50 to $15 per acre, and nearly 10,000 improved cattle that were estimated to be worth from $25 to $30 a head. The clearing house had agreed to accept the offered security and advance the money, but after this agreement was reached, and before consummating the deal and drawing up the papers, the attorney of the clearing house was called in and discovered the fact, during the conversation among them, that Fleming had given a previous mortgage or deed of trust in October or November as a means of strengthening the bank and carrying it on. Upon this information the attor-

ney stated that it might complicate the then offered mortgage; that the former deed of trust might be such a cloud upon the matter as to give some trouble with reference to the latter mortgage, and the clearing house thereupon "turned it down." This brought about the closing of the bank. There seems to be no question about the above statements. The State did not controvert these matters. That the bank was solvent from the standpoint of its assets in excess of its liabilities, we think there can be no question. After these matters were thoroughly investigated and books checked up and accounts all balanced up and value of the assets thoroughly canvassed, the bank officers and directors and the attorneys all were of opinion that the bank was solvent under the statute. It is in evidence also, in this connection, that Mr. Townsend and Mr. Templeton, both lawyers who were called into the matter as counsel, after a careful review of all the matters, informed and advised the bank directors and appellant that the bank was solvent within the contemplation of the Texas statutes, and that it was not in failing circumstances.

With reference to the matter of the attempt of appellant to strengthen the bank and its condition from that view-point, we wish to make this quotation from the 5 Cyc., page 565, under the head of "What is Fraudulent Receiving": "If the depositor would not have left his money had he known as much as the officers about the bank's condition, or if its condition was misrepresented to him with the view of influencing his conduct and had that effect, the taking of his deposit under these circumstances is a fraud on the depositor. When the bank is in truth insolvent, and this is known by the officers, but they expect to strengthen its condition and to continue, their action is not fraudulent in receiving deposits and they can not be recovered." See notes for supporting authorities.

Now if the bank, being in truth insolvent and known to the officers to be so, but they expected to strengthen its condition and continue its business, and their action would not be under those circumstances fraudulent in receiving deposits, then appellant's case ought to be placed beyond doubt, viewed from the testimony both of the State and the defense, that he could not be held for fraudulently receiving deposits under the testimony of this record. There is nothing in this record to show that the bank was insolvent at the time it closed its doors, but on the contrary, it was shown to be solvent under the evidence introduced as above stated. The State was permitted to prove through McBride that, after he took charge of it as receiver, and after making out his receiver's account, which has been above mentioned, that he undertook to settle up and pay off the indebtedness of the bank, but did not realize from some of the assets, and that some of them were not paid in full. All this testimony was objected to, and should have been excluded. This criterion of solvency would not be recognized as just or correct under any sort of circumstances. These matters occurred long after the bank went into McBride's hands as re-

ceiver, even as late as two or three years. It was also shown by him that he made no attempt to collect the assets that were deposited in the northern banks in New York City and other places, and that he instituted no proceedings of any sort to take charge of or handle those. These were first-class securities and largely in excess of the liabilities at those points—something like one hundred thousand dollars in excess of liabilities. Another instance may be mentioned, the Park Hotel matter, upon which the bank had advanced money and had security and control. This is sold by McBride, or under his direction, for $140,000.00, when it was shown to be amply worth $250,000.00, and not a great while after Mr. Cockrell for McBride sold the house for $140,000.00, it brought something like a quarter of a million dollars. So the court erred, and seriously erred, in permitting this evidence as a criterion of the solvency of the bank. The solvency of this bank depended upon its condition, not as worked out by the receiver, but as to its condition at the time of the closing of its doors.

We have mentioned these matters in a general way, as before stated, without taking up the propositions seriatim in order to combine two points, first, that the bank under the evidence was not insolvent, and, second, that the court's charge submitted to the jury a wrong legal theory of insolvency. This charge was excepted to and counter charge requested, which were refused. The court thus charged the jury:

"A bank is insolvent or in failing circumstances when it is unable to pay its debts in the ordinary or usual course of business.

"It is not expected to be able at once to pay every debt it owes, but it must be able to pay, or provide for, its debts as they fall due in the usual course of business.

"Insolvency or in failing circumstances, in the ordinary acceptation of the terms when applied to a bank, means inability to meet its liabilities in the usual course of business.

"A bank is not insolvent or not in failing circumstances if it has sufficient assets realizable in cash value to meet its liabilities as they fall due in the ordinary course of business, treating them as an ordinarily prudent person would ordinarily conduct his business.

"If it has not sufficient assets realizable in cash value for this purpose when thus treated, then it would be insolvent and in failing circumstances."

The following instructions were requested by appellant: "You are instructed that by the term 'insolvency,' as applied to this case, is meant that the Western Bank & Trust Company did not have sufficient assets to pay its debts. By the term 'failing circumstances' is meant, as applied to this case, that the Western Bank & Trust Company did not have sufficient assets to pay its debts.

"By the term 'assets' is meant the property, real and personal, belonging to said bank, its bills receivable, notes, obligations due the bank of any and every character, considering the solvency of the makers, endorsers and guarantors thereof, and the value of the securi-

ties thereon, if any, also including all stocks and bonds held by the bank as its property.

"If you find and believe from the evidence, or have a reasonable doubt concerning whether the Western Bank & Trust Company of [on] January 14, 1908, owned and held assets as above defined sufficient to pay its debts within a reasonable time, in the ordinary course of business under the conditions existing, then said bank was not insolvent or in failing circumstances within the meaning of the law; and if you so find or have a reasonable doubt concerning, you will acquit the defendant."

The further charge was requested and refused: By the term of 'ordinary course of business' is meant the reasonable time in the ordinary course of business measured by the experience of business methods under existing conditions in which property and assets of an institution may reasonably be converted into money and applied to payment of a debt."

We are of opinion that the test given by the court in his charge is not the correct one. The sounder and better rule is laid down in the special requested instructions which were refused. Ellis v. State, 28 L. R. A., 444 (new series); State v. Clements, 85 N. W., 229; Parrish v. Com., 123 S. W., 339; Central Law Journal, vol. 37, p. 147.

The statute imposing penalties upon officers and directors of banks for receiving deposits in their banks at a time when insolvent, and at a time when such officers and directors had knowledge of such insolvency, have been adopted in some of the states. They are comparatively of recent origin, and this may account for the fact that cases construing such statutes are limited in number. Our statute, which is quoted in the early part of this opinion, was enacted in 1897, and has not been before the courts except in the Roby case, 41 Texas Crim. Rep., 152. That decision did not go into anything like a broad discussion of the statute, but it was held under the circumstances stated in that case that the Tyler Banking Company was solvent. We make this quotation from that case: "It is also contended the evidence not only does not support the conviction, but refutes the allegation of solvency. As we understand the statement of facts, it is proved beyond doubt, and is not questioned by the State, that the individuals composing the Tyler Banking Company were not only able to meet every obligation, but were worth in excess of all liabilities, including the liabilities of the banking company, one hundred thousand dollars subject to the payment of their liabilities and indebtedness." The distinction between the Tyler Banking Company and this company is that it was not an incorporated bank, while this bank was alleged to be incorporated. But we are of opinion that this would not be a material difference where the facts showed that the assets of the incorporated bank were sufficiently in excess of the liabilities to meet the obligations of the bank if prudently managed. It would not be expected legally or in good conscience that, under the circumstances under

which the Tyler Banking Company closed its doors or the circumstances under which the Western Bank & Trust Company closed its doors, that its assets would be required to be turned into cash at once in order to meet liabilities. Banks can not thus be managed under the banking laws. If the rule is to be adhered to that a banking concern must keep its financial matters in such condition that its assets could be turned into or required to be turned into cash at such short notice, it would be a matter of impossibility for a banking concern to exist with any degree of safety, and under such a rule its officers might and could at any time be adjudged criminals and made felons when there was no evidence of fraud or rascality on their part. That rule is too harsh; it is not in accord with fair judgment or good conscience, and would be more than detrimental to the commercial and financial interests of the country and the depositors. Under the banking laws, as a rule, banks are required to keep a certain amount of their capital on hand in cash. It is not expected that its deposits are to be held in cash in the vaults. This would be in violation, it occurs to us, of the statutes under which they are inaugurated and permitted to live and carry on the business. Again, the rule that the bank must be able to meet all checks and demands made upon it at once, would be more than harsh, or it would place banks at the mercy of any combination formed against it and place it at the mercy of those holding checks and drafts against it if they should see proper to make a run upon it when it was not prepared upon the moment to collect in its cash or loaned money. At the time this bank closed it was not only shown in the record but is a matter of current history that our country was in a financial panic, and it was impossible for the banks to meet their liabilities from one end of the country to the other. Under the rule or criterion set forth in the charge of the court, doubtless under then existing circumstances any bank, and perhaps every bank in the country, could have been held to be insolvent, and its officers made felons. This record shows that among the banks in the city of Dallas, where this bank had its domicile, there were twenty-five million dollars deposits, and in the vault of all the banks there was only about a million dollars in cash to meet the ordinary course of daily business. They were only paying out small amounts in order to avoid closing their doors and bring a financial crash to the banks themselves and inevitable ruin to the depositors. The banks are not run simply for the convenience of the owners of the banks. The depositors have a wide and extensive interest in the solvency of the banks. They place their money in these in good faith, expecting to get it as they need it. If any untoward circumstance should occur and a run is made upon the bank, a combination formed for that purpose could ruin any bank almost at any moment, however solvent it might be. The depositors have an interest in the bank at least to the extent that when their money is placed there it is with safety and security, and with confidence that it may be returned at the time needed. The

officers are not alone the interested parties; the depositors and business interests are likewise interested.

We are of opinion that the court's charge was error and the exception well taken, and that the requested instruction presented a sound and safe rule, and should have been given in charge to the jury. A very fine discussion of this matter will be found in Central Law Journal, volume 37, page 147. We make some extracts from that citation in support of the doctrine announced in the refused instructions and here approved:

"Should the court say in a criminal case that the Legislature intended to require bank officers to return to depositors their money on demand, at the peril of becoming criminals? If so, then clearly the Legislature has placed a severe and unnatural limitation upon the business of banking. A deposit of money in a bank is nothing more nor less than a loan to the bank. Why should the above severe rule be applied to bank officers who borrow money and not be applied to any other borrower? Would it not be more in accord with natural justice to apply the more reasonable rule that the statute was intended to protect the depositors from ultimate loss? Should we not rather say that the Legislature intended to use the word insolvency, in this penal statute, in its general and popular sense? For instance, solvency means 'ability to pay at some future time, upon settlement of one's estate.' Insolvency means, 'sometimes the insufficiency of the entire property and assets of an individual to pay his debts,' the general and popular meaning. In a more restricted sense, 'inability to pay debts as they become due in the ordinary course of business.' Again, 'Insolvency is owing debts in excess of the value of one's tangible property. Without debts there can be no insolvency.' 'Insolvency: condition of being insolvent; want of means or of sufficiency of property for the discharge of all debts or obligations.'

"While the foregoing are undoubtedly the popular and general meanings of solvency and insolvency, the courts in administering the bankruptcy and insolvency laws and laws regulating assignments for the benefit of creditors, have given the words limited and restricted meanings. Under those acts insolvency means inability to pay one's debts in the ordinary course of business. Also under insolvent acts, where it was necessary to protect the creditors and compel an equal distribution of the insolvent's estate. The main purpose of the bankrupt act was to compel a debtor to distribute his property equitably among all his creditors. Hence the following definition in the case of Buchanan v. Smith, supra: 'Insolvency in the sense of the bankrupt act means that the party whose business affairs are in question is unable to pay his debts as they become due in the ordinary course of his daily transactions, and a creditor may be said to have reasonable cause to believe his debtor insolvent when such a state of facts is brought to his notice respecting the affairs and pecuniary condition of his debtor in a case like the present, as would lead a prudent busi-

ness man to the conclusion that he, the debtor, is unable to meet his obligations as they may mature in the ordinary course of business.' By the terms of the act the creditor could not procure a preference if he knew of the failure of his debtor to meet obligations when due. The rule was applied particularly to traders, merchants and bankers. And this limited meaning of 'insolvency' was first applied under the bankrupt act, and for the above reason and no other. By what line of reasoning, then, can the restricted meaning be applied to the word when used under the penal statutes under discussion? Clearly no purpose is intended to be served by these statutes kindred to the purpose of the bankrupt acts. The objects of the two are entirely dissimilar. The penal statutes are supposed to prevent fraudulent banking. They are not intended to force all banks to keep all deposits in the vault ready for the depositor to call. Statutes regulating banking expressly permit the loan of deposits by requiring the bank to keep on hand a reserve of only fifteen to twenty percent of their deposits. Does the Legislature permit banks to loan eighty to ninety percent of deposits, and at the same time fix a heavy penalty for not always having the same money on hand to pay out on demand? Yet this is the logical conclusion from the rule adopted in State v. Caldwell. As to rules of interpretation of statutes: 'The language of our statutes is, in the greater part, not technical in either sense above explained, but popular; to be understood, therefore, in its common popular meanings.' 'Ordinarily the language is to be understood in its common signification; as, for instance, general terms are to receive their general, not restricted, sense.' If the Legislature intended to compel banks to meet all demands of depositors without delay, instead of saving the latter from ultimate loss, then it has attempted an impossibility, and the courts will be forced to hold the statute void as subversive of fundamental principles of right and justice. . . . The application of these principles and rules would require the courts to construe the penal statute under consideration so as to permit banks to do business if they are in condition to save depositors from ultimate loss; that is, if their property is worth more than all their liabilities, even though their condition be such at the time of receiving a deposit that maturing obligation soon after force them to suspend."

Without making further quotation, we would refer to Ellis v. State, supra, State v. Clements, supra, and Parrish v. Commonwealth, supra.

We therefore, under the general statement above made, reach the conclusion, first, that the court's charge presented the wrong criterion and gave erroneous instructions as to what insolvency means, and as to what "in failing circumstances" means; and second, that the requested instructions presented the better and sounder rule, and should have been given in lieu of the charges given by the court; and third, that under the facts, and what has been already said, the evidence does not show that the bank was insolvent.

Again, it was necessary under this statute, in order to sustain this

conviction, that three things should concur as to appellant personally, or as president, rather, of the bank: First, that he received or assented to the reception of the deposit, if we should treat the check as a deposit; and second, that he knew the bank was insolvent or in failing circumstances; and third, that there must be evidence of the fact that such reception was attended by circumstances indicating fraud. This record shows that appellant was president nominally of the Western Bank & Trust Company, paid but little or no attention to its affairs for months, being absent in the Panhandle country on his ranch most of the time. It is also shown by the evidence that he was not charged as president with the duty of receiving deposits, and did not have control over these matters. It is also shown by the State's evidence, as well as by defendant's, that appellant was not aware that the check had ever been left with the bank until sometime after it had closed its doors. Mr. Sides, who testified that he received the check from Boedeker Manufacturing Company, stated that he left it at the bank about three o'clock on the evening of January 14, 1908, delivering it to the receiving teller of the bank, whose name was Smith, and that Smith gave him credit on account of Sides & McAlister. There was no oral or special agreement between himself and the bank at the time the check was deposited and credit given his firm. That, in fact, nothing was said between himself and Smith about it. He testified Fleming was not present; that he did not see him that day; about a week after that he had a conversation with appellant. Appellant knew nothing, therefore, of the transaction, from this witness' testimony, and did not know the check had been placed in the bank until days after the bank had closed. McAlister testified he was a member of the firm of Sides & McAlister, and he knew nothing of what occurred when the check was left at the bank—was not present. He said the bank closed on the 15th of January, and he subsequently had a conversation with appellant in regard to it. Appellant's evidence shows he knew nothing about it, and never heard of it until subsequent to the bank closing. We may then state with confidence from this record, as an undisputed fact, that appellant knew nothing personally of the transaction until after the bank had ceased operation; therefore we deem it unnecessary to go through the record and collate the evidence in this respect. Personally, therefore, the appellant knew nothing of the transaction, and had nothing to do with it. Under the charter and by-laws he was not charged with receiving these matters, nor with control over the receiving teller or other officers whose duties it was to look after the subsidiary matters of the bank. We may state further, there is nothing in this record to show that he assented to the reception of the check. That an officer of the bank may be held responsible, either civilly or criminally, for assenting to the reception of a deposit, might be true. This would depend upon the attendant facts and circumstances. The bank, of course, is responsible civilly for the reception of deposits, but it would

not necessarily follow that the officers of the bank would be individually responsible where the institution is an incorporated one, but we do not purpose to enter into that field of discussion. And it may be stated that an officer might become criminally responsible for assenting to the reception of deposits if, knowing that the bank was insolvent, and he gave instructions to or agreed with those in the bank to receive money in order to appropriate it, or to in any way divest the title of the owner of the money and pass it into the bank's hands in such way that it would be fraudulent. The facts might show him guilty criminally, but under our law, in order to make him guilty criminally, he must do the act himself, or he must aid, advise or encourage it to be done, if in that connection the act when done was to cheat or defraud. There is a marked difference between civil and criminal responsibility. Referring to our statute, which has been previously quoted, we are of opinion that in order to hold an officer of the bank, or one of the parties connected with the bank, such as mentioned in the statute, criminally responsible, there must be some evidence of fraud on his part. There must, in connection with the knowledge of the fact that the bank is insolvent, [be] a purpose in receiving deposits to place the depositor in such position that he would thereby lose his money. The only way, we think, to make this Act of the Legislature consistent with our general principles of criminal jurisprudence, and with the idea of our civilized and enlightened government, is to read into the statute after the words "shall receive or assent to the reception of any deposit of money or other valuable thing into such bank," the following language, in substance, "in such way as to deprive the owner of the value thereof and the title thereto, and to invest the title and ownership of the thing of value deposited in the bank." Words of similar import or like signification should also be read into the second clause after the words "shall create or assent to the creation of any debt or indebtedness in consideration or by reason of which indebtedness any money or valuable property shall be received into such bank," the following, "in such way as to deprive the owner of the value of the deposited thing and its title, and to invest the title and ownership of the money or property in the bank." Such we understand to be a construction of law with reference to general deposits of money or negotiable securities, the title to which passes by delivery. This construction of the statute would harmonize with the general principles of criminal jurisprudence and the general spirit of our laws.

In this connection it may be well enough to refer again to the facts. In view of what has been said, a review of the record and statement of facts in this case will disclose that there is nothing to show that, even if the bank was insolvent, that Fleming, appellant, knew of that insolvency. Recurring again to the facts, it was shown that a careful review of the entire business of the bank was made, and after throwing out all doubtful and indifferent accounts and bills receivable

and notes and other property, the bank was clearly not insolvent; that the assets exceeded, as we recall the evidence under that test, something like $275,000 above its liabilities. The board of directors reached the conclusion, and so advised Mr. Fleming at the time, that the bank was solvent, and that the business could safely go on. Whether satisfied with this or not, he took the advice of counsel, and they advised him in the light of the statute and its terms, under the condition of the bank, that it was clearly not insolvent and could carry on its business.

There are other very interesting questions, several of which present clearly reversible errors, but in view of what has been said and on account of the great length of the opinion required, we do not purpose to discuss those assigned errors.

There was presented a motion to change the venue, and an application for a continuance, which were overruled. Should another trial occur the absent witnesses may be present at the trial, but in regard to the change of venue we would say, if this matter should be presented to the court again under similar facts as those contained in this record, a change of venue should be promptly ordered. There has not been presented to this court, perhaps in its history, a case more rigidly demanding a change of venue than here shown. From one end of Dallas County to the other the bank matters had been discussed on the stump by candidates for office; it had been made the turning point in the county attorney's race whether appellant should be indicted or not. He had been denounced "from the stump" all over the county in speeches, using all character of epithets and applying all sorts of harsh language accusing him of crime, and the candidate for county attorney who made these speeches had been elected, and this indictment followed, although several terms of the court had passed and the grand jury had steadily refused to indict. Special counsel in this case took an active part in the campaign in the county, using vigorous and denunciatory language. The papers had taken up the matter and discussed it, and these papers were shown by this record to have a wide circulation all over the county. These matters had become household words in every nook and corner of the county. It is to be deprecated that things of this sort should be injected into local politics. Such proceedings are conducive to the mob spirit. A party who is charged or suspected of violation of the criminal laws is entitled, wherever a conviction is sought, to a fair trial before an impartial jury. The Constitution provides, as does the statute, that where combinations exist against him, or the feeling of the community is such that it precludes a fair trial, that the venue of his case shall be changed to a county where these matters do not exist. We would caution district judges again that, where matters are presented as in this motion for a change of venue, showing that a party can not obtain a fair and impartial trial, there should be no hesitancy in awarding a change of venue to some county where such conditions do

not exist; and we desire also to call attention again to this further fact, that, where a change of venue is asked for, and the facts justify or require it to be granted, that the change of venue should be made to some county where similar conditions do not exist, or similar things can be brought to bear against the accused or the State, as the case may be. It is not the history of our people or our race, nor the theory of our law, that a man shall have a partial trial or be judged by a partial jury. It is difficult to conceive how, under our theory of government and criminal jurisprudence, the life or liberty of a citizen should be sought except under a fair trial before impartial jurors, as provided for and demanded by our Constitution and laws. Nothing, perhaps, will conduce more in this country to the mob spirit, and in every way prevent that fairness of trial which forms a part of the heredity in our race of people, than just such occurrences as shown by this record. That idea has been the growth of our civilization and our criminal jurisprudence in its history, not only in the United States, but in England. The Constitution provides that he shall have a fair trial before an impartial jury, and this means such a trial and before such a jury as are not warped or influenced by influential combinations and circumstances of prejudice. We say this much in regard to change of venue should another motion be made upon another trial.

Without discussing further errors assigned, some of which are clearly reversible, for the reasons indicated this judgment is reversed and the cause is remanded.

*Reversed and remanded.*


PRENDERGAST, JUDGE.—I agree that this case should be reversed and remanded, on the ground of the error of the court in defining insolvency, and think the law is as the opinion lays it down in this respect. Not having had the time and opportunity to investigate the other questions involved, I express no opinion at this time, inasmuch as the record is very voluminous, and I have had no chance to investigate until the opinion was written today by our presiding judge.


HARPER, JUDGE.—I agree that this case should be reversed and dismissed on the grounds of defects in the indictment and the error of the court in defining insolvency. The law in respect to insolvency is as laid down by Judge Davidson in this opinion. The opinion not having been written until today (the day of adjournment), I have not had opportunity to investigate the record, nor other questions discussed in the opinion in this case, but inasmuch as the case must be dismissed because of defects in the indictment, and for that reason the other questions are not essential to a disposition of the case, I do not think the opinion should be longer delayed.

PRENDERGAST, Judge.—The record and briefs in this case are very voluminous. I regret exceedingly that, with the press of other cases and the almost necessary haste incident to the adjournment of the term, we did not have the opportunity for more repeated consultations and consideration of this case.

There are several difficult questions presented. With the disposition of the case by the court, I think it altogether unnecessary to express an opinion on many of them. In fact, it occurs to me that the opinion on all of them except as to the sufficiency of the indictment, as the court holds it fatally defective, are obiter dicta. However, in view of the opinion of the court prepared by my brother, Presiding Judge Davidson, and handed down, I deem it necessary to express my opinion very briefly on some of the questions discussed and determined by him in the opinion. I will merely state them without argument or citation of authority.

1. I incline to the opinion that the indictment is sufficient.

2. I think the allegations of the receipt and deposit of the check sufficient. That the title of the check passed, under the facts proven, from the depositor to the bank.

3. I express no opinion as to the sufficiency of the evidence to establish the insolvency of the bank at the time of the deposit.

4. Many of the objections to the testimony of the witness McBride were more to the weight than the admissibility thereof. Where hearsay, it was clearly inadmissible. Much of his testimony was admissible, in my opinion.

5. The knowledge of the appellant of the insolvency of the bank, if so, as well as the solvency or insolvency thereof, could be shown by facts and circumstances, as well as by direct testimony, and in my opinion the evidence on these points was amply sufficient to submit these questions to the jury for its findings.

6. I expressly dissent from the opinion of the court as written by Judge Davidson, wherein it holds that the statute under which this prosecution was had should be read as if certain words were inserted therein which are not therein. That is for the Legislature, and not this court.

7. I am clearly of the opinion that the charge of the court as to what is insolvency or in failing circumstances under said statute was wrong, and that the charge requested by appellant, as quoted in the opinion herein on that subject, should have been given instead. And for this reason, in my opinion, the case should be reversed and remanded.