Booth, Judge,
reviewing the facts found to be established delivered the opinion of the court:
The claimant company, a New Jersey corporation, made a written agreement to supply the defendants, through the Isthmian Canal Commission, with certain quantities of suction hose. The contract was the result of a response to a public circular inviting bids for this and other classes of merchandise. The circular described in detail the quan *243 tities, sizes, and qualities of suction hose, and in addition thereto set forth with much particularity carefully prepared specifications for its manufacture and test. Among other specifications which subsequently became part of the contract, the following are especially pertinent:
“ 8. Friction.—Hose must comply with friction tests as follows: A section 1 inch long will be taken from any part of the hose and the friction determined by the time and the force required to unwind 6 inches of the hose, the force being applied at right angles to the line of separation. Force used will be 15 pounds, and when unwinding the average speed must not exceed 6 inches in 10 minutes.” *****
“2. Inspection and tests.—All hose to be inspected at works by representatives of purchaser before shipping upon due notice that material is ready for inspection. Hose will be tested in presence of purchaser’s inspector either at works or at such other place as purchasing officer may specify. If at former, contractor shall furnish all facilities necessary to make tests without extra charge. Inspector to indicate pieces to be tested as samples of whole lot presented for acceptance. With each lot of 200 pieces or fraction thereof ordered, one 6-foot length with proper couplings must be furnished free of cost for test.”
*****
“ 4. Material.—All hose must be soft and pliable, made of stout, long-staple cotton duck, Para tube, friction, and cover. Thickness of tube and cover and weight of duck to be in accordance with table given for kind of hose specified. It is desired that hose comply strictly with these specifications, and to be suitable for tropical climate.”
“ Construction.—The plies of canvas must be frictioned on both sides and be firmly joined by distinct layers of rubber. The tube, friction, and cover to be of the same quality of gum. No rubber substitutes to be used. If reclaimed or old-stock rubber is used, the bidder must state the percentage of same. The compound to be made from well-seasoned Para. The inside of the tube must be smoothly made and free from imperfections and cracks, special attention being given to have a good job at the point where the enlarged end begins on short lengths.”
4¡ * * * «
Articles III and IV of the contract provided as follows:
“Article III. The commission reserves the right to make preliminary inspection of articles or materials to be fur *244 nished hereunder at the point of manufacture or purchase and to there determine whether the materials or supplies comply with the specifications, and may at such times reject any such materials or supplies as being deficient in good workmanship or as not complying with the specifications; but final inspection and acceptance will only be made on the Isthmus after delivery as above. When required, the material necessary for making tests shall be furnished at the contractor’s cost.
“Article IY. Upon delivery on the Isthmus and final inspection and acceptance by the commission of the articles and materials covered by any order issued under this agreement there will be paid to the contractor, at the office of the disbursing officer of the Isthmian Canal Commission, at Washington, D. C., as soon as practicable, provided provision has been made therefor by Congress pursuant to section 5, act of June 28, 1902, 32 U. S. Stats., 483, ninety (90)' per centum of the contract value of the materials or supplies so accepted; and within sixty (60) days thereafter, upon the execution, if required, of a release by the contractor of all claims against the United States on account of such order, there will be paid to the contractor at the said office the remaining ten (10) per centum due upon the full performance of such order by the contractor.”
The claimant company manufactured and delivered to the defendants at various times under said contract 6,500 feet of suction hose. Each shipment was inspected in accord with the provisions of the contract, and no complaint was made in reference thereto until after the expiration of from three to eight months, when about 1,280 feet of the hose was rejected as being defective and not in accord with the specifications and contract. The rejection resulted from a use of the lengths condemned and followed the injection into the contract of a new method of friction test materially different from the one originally prescribed, as set forth in specification 8, supra.
During the course of the contract dealing the parties to the agreement modified the last clause of specification 2, supra. It was found impracticable to furnish the 6-foot length for test as therein provided, and in consideration of a waiver of this requirement in all its rigidity the claimants gave an express warranty that the hose furnished under the contract was the equal in every respect of the sample furnished for test.
*245 The defendants deducted $2,537.20 from the amount due the claimants as the contract value of the hose rejected, and it is for this amount the claimant company sues. An obvious error, conceded by the defendants, is an overcharge against the claimant of $306.25, a sum .charged against it when in fact it was not the manufacturer of the hose at all.
It is apparent from the findings, as to the accuracy of which there is no material dispute, that the claimant company in the performance of its contract furnished hose which successfully passed all the requirements of detail of manufacture and test presented by the contract, and no defect was discovered until the actual use of the lengths of hose thereafter rejected by the defendants’ officers on the Isthmus. The hose was first inspected by the defendants’ officers at the factory, was then subjected to a scientific test at the Agricultural Department at Washington, and the record, distinctly free from doubt, discloses that it was thereafter accepted for shipment to the Isthmus. The friction test proposed by the specifications has in this instance a peculiar significance, because by its express terms it contemplated a subjection of the hose to a specified method of unwinding, which did not disclose the adhesive qualities of the inner tube of rubber to the cotton duck. The hose rejected was alleged to be faulty in this respect, the inner tube of rubber collapsed under pressure, and the scientific test applied to ascertain this fact aside from usage, as appears from Finding Y, was a decided variation from the contract test, and one distinctly individual, not being recognized as the usual and customary one by those engaged in the trade.
The contract provided for three separate inspections of the hose; the final one to be made by the officers of the defendants on the Isthmus after delivery. While the express language of the contract reads “final inspection and ac-' ceptance will be made on the Isthmus after delivery,” there was no formal mode of acceptance prescribed other than the issuance of the necessary voucher in payment of the order, 10 per cent of the amount being retained as further surety for compliance with the contract. Nothing is said as to time or manner of final inspection, although it appears that all the hose complained of passed a satisfactory inspection as to *246 external appearance and leakage, nothing being done in the way of a friction test on the Isthmus.
The contractor’s obligations under his contract were succinctly stated and not difficult to understand. The defendants expressly provided for the exact kind of hose they desired, the quality of material to be used in its composition, and the respective tests to be employed to determine whether it met all the requirements of the contract. Viewing the transactions from a practical aside from a technical significance, it is obvious that the contractor, in discharging his obligations, furnished the hose under the rigid terms of the contract without incurring a single criticism or penalty until from three to eight months after it reached the Isthmus.
It is insisted, however, that out of the express language of the contract an implied warranty arose to furnish “ motion hose” and suction hose as generally understood among the trade is a hose so manufactured as to withstand pressure without collapsing, and that notwithstanding the specifications this general warranty obtained. There can be no doubt that the defendants expressly specified “ suction hose, 20-foot lengths,” and if the specifications following the general description of the merchandise wanted had been omitted the defense would be invulnerable. It is more accurate to state as a logical inference from the whole transaction that the defendants wanted suction hose made exactly in accord with and from the material specified in detail in the contract. The contractor was not engaged to make suction hose according to his own knowledge of and skill in the trade. On the contrary, he was to manufacture it in accord with the defendants’ idea of what constituted suction hose for the purposes of the contract. The tests prescribed were inserted for the express purpose of determining whether the contractor had executed his task in a workmanlike manner, correctly interpreted the specifications, and furnished the article contracted for. The case is quite different from one where the sale or manufacture of a desired article is attended only with the expression of its general designation and the known purposes of its use in the trade. If the defendants merely wanted suction hose, procuring it was a matter of simple *247 formality, for suction hose has a distinct and well-understood meaning in the trade. In the case of MacKnight Flintic Co. v. Mayor, 160 N. Y., 72, a contractor agreed, according to certain plans and specifications, to construct water-tight floors, and it afterwards developed that, despite the workmanlike maimer in which the work had been done, the floor leaked. The court said:
“The reasonable construction of the covenant under consideration is that the plaintiff should furnish the materials and do the work according to the plans and specifications, and thus make the floors water-tight so far as the plans and specifications would permit.”
In Seitz v. Brewers Refrigerating Co., 141 U. S., 510, the authorities covering this phase of the case are cited and the subject matter fully discussed.
Again, it can not escape observation that the claimant company delivered the hose to the defendants on the Isthmus in apt time under the contract. It then became the duty of the defendants, under all the circumstances of the transaction, to make the final inspection and return a definite assurance one way or the other as to its acceptance or rejection, and to do so in such time as to enable the contractor to comply with his contract, for a liquidated damage clause inserted in the agreement penalized the contractor for all delay in making deliveries. In fact, most stringent provisions in this respect, extending even to the annulment of the contract, were expressly inserted by the officers of the United States. It is a long distance from New Jersey to the Isthmus of Panama, and the transportation of supplies is a matter of considerable importance and time. We need not sustain an assertion by the citation of numerous authorities that some limitation obtains as to the exercise of a reservation so rigid and consequential, and that is it must be invoked within a reasonable and proper time. The hose delivered was, as the findings show, subjected to what the officers state to be a “preliminary test” and then permitted to remain in storage for from three to eight months before any objection was found. The contract made no provisions for a preliminary test on the Isthmus. Articles III, IV, and V *248 point out the time and number of tests which the hose must undergo. These articles, both comprehensive and restricted in terms, were placed in the contract by the defendants, who drafted the same, and the obligation imposed upon the contractor can not be extended by their terms to such an undue length of time as may suit the convenience of the defendants. If articles of merchandise to be manufactured and delivered under certain precise specifications and subjected to certain prescribed inspections and tests meet the specifications, inspections, and tests, and no complaint with respect thereto is made within a reasonable time after their final delivery, the transaction under the contract is closed. It is the equivalent of final acceptance and can not be reopened because of failure to apply a test which could and should have been made in the first instance, which when belatedly applied demonstrated an alleged defect. Brown v. United States, 1 C. Cls., 307; Finney v. United States, 32 C. Cls., 546; Universal Trading Co., 20 Comp. Dec., 337; Carlisle & Thomas, 21 Comp. Dec., 150.
What constitutes a reasonable time depends upon the circumstances of the individual transaction, the nature of the merchandise to be furnished, and all the attendant incidents of the contractual obligations. Shearer v. Park Nursery Co., 103 Cal., 415. In this case suction hose, when delivered, is susceptible of practically immediate inspection and test. The findings conclusively establish the fact, and it is manifestly incontrovertible, because in point of fact the greater amount of hose furnished by the contractor under his contract was put in use and no complaint with respect thereto was made. The hose retained in storage was the subject of rejection.
The claimant company expressly warranted the hose to be equal in all respects to the lengths furnished for tests. This warranty was in all respects legal and binding and applied to all the hose furnished under the contract. The willingness of the claimant to make the warranty exhibits its good faith and in no wise authorized the defendants to relax the vigilance required of them under the inspection and test articles of the contract. It did not extend the time or manner of *249 inspection and imported no new terms into the contract with reference thereto. The defendants, to avail themselves of a breach thereof, must, under the contract, assume the burden of showing a divergence in quality between the lengths furnished for test and the total amount furnished under the contract. There is nothing in the record to establish the same; on the contrary, the hose finally rejected was not subjected to the test imposed upon the lengths furnished by the claimant under the contract, and nothing whatever appears upon which a finding could be predicated showing a variation in quality in this respect. The hose was never put under suction pressure before it reached the Isthmus; the so-called preliminary test did not embody this feature; the contract did not provide for such a test; and, so far as the record discloses, there was no breach of the express warranty. It can not be said that the application of a certain mode of inspection and test quite different from that provided in the contract is available to show a breach of an express warranty under an express contract to manufacture merchandise of a quality expressly defined in the agreement. The hose rejected should have been tested in the same manner and under the same conditions as the sample lengths, or, if subjected to pressure as a method of final inspection and test, it should have been done within a reasonable time after its final delivery on the Isthmus.
The court has not overlooked the relative situation of the parties in reference to the subject matter of the contract. The disadvantages, if any such existed, were in most respects mutual. The officers of the Government, exercising the characteristic care and foresight indispensible in contracting for supplies to be transported a long distance, to be used under different climatic conditions, and for especial and important purposes, imposed upon the contractor supreme care and prudence in their manufacture and delivery. The contractor assumed this burden in all its details, and if he discharges his obligation by meeting the-express conditions of the contract and delivers the articles he agrees to deliver, no liability attaches because in the end it may not in all respects meet fully the anticipations of those engaged in its use. There *250 is absolutely nothing in the record that remotely suggests the degree or extent of pressure under which the hose is alleged to have collapsed, and nothing to show the resistive qualities of the hose made in accord with the specifications as to size, thickness, etc. The manner of test which is alleged to have brought to the surface the defects complained of is described alone by the term “use.” Where and for how long it was used, by whom and for what purpose, is all left to inference and supposed common knowledge of such facts. Some degree of carelessness prevailed, for in the condemnation this contractor was overcharged a sum for hose it never manufactured or delivered, and which is admitted in this case. The contractor received no intimation of dissatisfaction until months after the hose had been delivered. During this time claimant received repeated orders for additional hose under the contract and at least two additional orders outside of the contract, all of which it furnished from time to time under the positive belief of satisfactory final inspection, test, and acceptance. The contract expired by limitation on June 30, 1910, and it was not until some time in September thereafter that the contractor received notice of these rejections, although made previously. Orders continued to come in for additional suction hose made under exactly the same circumstances as the rejected hose, and even after the same had been rejected, both under the contract and independently thereof. Under all these facts, can it be said that the contractor may be indefinitely kept in ignorance of a serious defect in an article at least apparently approved in every way ? Most assuredly the defendants must be held to an observance of some degree of reasonableness in point of time and be not permitted to constructively at least lead a contractor into the belief that his goods are acceptable under the contract and will be paid for.
Judgment is awarded claimant in the sum of $2,537.20. It is so ordered.