Campbell, Chief Justice,
delivered the opinion of the court :
The Treasury Department having called for bids for furnishing designated electrical equipment to be used in connection with other electrical machinery at the sanatorium, Fort Stanton, New Mexico, the plaintiffs made a proposal to supply same for $1,400. Their bid was accepted upon *409 conditions stated in the letter of acceptance. They shipped the machinery and after its arrival at destination it was found upon inspection to have defects which, except in one particular, need not be detailed. This exception is that the flywheel, or some of its spokes, was broken. The plaintiffs sought to supply another flywheel but found it would be necessary to ship a part of the machinery back to the manufacturer. They were called upon to determine what course would be pursued and decided to have the machinery returned to Washington. They had it transported to the railroad station and reshipped by rail to themselves at Washington, where they sold it for $700, having supplied a new flywheel. They sue to recover the balance of the contract price, $700, besides about $600, the expenses incurred in reshipment and storage. Taking issue with the plaintiffs’ contention, the Government also insists that the contract was rescinded.
The plaintiffs refer to the familiar rule applicable where a vendee does not take and pay for personal property sold, in which case the vendor may store the property and sue foi the price, or may sell it and recover the difference between the contract price and the market price of the property sold or may keep the property and recover the difference between its market price at the time and place of delivery and the contract price. These are remedies accruing to a vendor in possession where the vendee refuses or fails to accept. But this rule does not account for the claim asserted of the expense incident to the reshipment and storage of the electrical machinery, including the broken flywheel. Nor standing alone does this rule account for the vendors having retaken possession of the property after its delivery if it was so delivered. The plaintiffs also cite and rely upon a line of cases in this and other courts where a contract with the Government provides for final inspection before shipment, or, as stated in the contract in a case involving wagons, “ when finished, painted, and accepted by an officer or agent of the quartermaster’s department and delivered as herein agreed, they shall be paid for,” that in such case, the inspection provided for in the contract being had, the Government was bound to pay. See Brown's case, 1 C. Cls. 307; *410 Kerchner case, 7 C. Cls. 579; Finney case, 32 C. Cls. 546; Electric Fireproofing Co. case, 89 C. Cls. 307. In another case, United & Globe Rubber Mfg. Co. v. United States, 51 C. Cls. 238, 248, this court said that where articles of merchandise “ to be manufactured ” and delivered under certain precise specifications and subjected to prescribed inspections and tests meet these specifications, inspections, and tests, and no complaint with respect thereto is made within a reasonable time after final delivery, the transaction under the contract should be regarded as closed. If the plaintiffs sold to the Government the electrical machinery under agreement that the same should be finally inspected at Washington and when so inspected and) approved it should be shipped and delivered f. o. b. cars at a distant point, and it was so delivered in good condition, the case would be brought within the decisions mentioned. But such is not this case.
There was an advertisement calling for proposals to be opened in the office of the custodian of the U. S. Sanatorium, Fort Stanton, New Mexico, for furnishing and delivering f. o. b. cars Capitán, New Mexico, a specified “ direct connected electric generating equipment ” that would be “ capable of operating in parallel with a 40 kw. Skinner engine.” While the preference was expressed for a new engine and generator, the advertisement stated that “ a second-hand outfit in first-class condition ” would be considered, and that payment would be made after the electric generating unit was set on its foundations, tested out, and demonstrated to be in proper working order and “ will parallel with the Skinner machine.” The plaintiffs’ proposal offered certain generating equipment, being a “ Harrisburg engine direct connected to Sprague generator ” that would “ parallel present set,” and being “ second-hand in guaranteed good condition.” This proposal also stated that the property was located in Washington, where it could be inspected by the Supervising Architect’s Office. Under date of December 14, 1917, the plaintiffs’ proposal was accepted in a letter, which stated that the acceptance was made upon the understanding that the machinery would be cleaned of rust and painted with white lead and *411 oil before shipment and that such “shunt” would be furnished for installation as would be necessary for the “ proper operation of this set in parallel with the generating set in place.” It further stated that the custodian of the sanatorium would be furnished a copy of the letter and requested “ on satisfactory installation of the equipment in accordance with specification requirements ” to pay for same by voucher. The plaintiffs, having deposited their certified check in accordance with the call for proposals, it was stated that the same would be deposited and the proceeds held “ until the satisfactory completion of the work.” An inspector was sent to the warehouse where the equipment was stored to ascertain whether it was properly prepared for shipment. He reported and plaintiffs were informed that certain cleaning and painting should be done and another inspection made, and upon this second inspection the inspector reported the parts were in proper condition for shipment.. The equipment was packed and crated by plaintiffs’ agents and went forward to Capitan. It is very clear from this recital of undisputed facts that this is not the case simply of a sale of personal property to be delivered at a stated place. The property was indeed to be delivered “ f. o. b. cars Capitan,” but it was to be property of a definite description, intended for a specified use, and adapted to a named purpose and use. It was not to be paid for until by test it was demonstrated to be in “ proper working condition ” and that it would “ parallel with the Skinner machine.” The inspection at Washington could not make this demonstration and was not intended or understood to be final. The finding is that these two inspections were not made with a view of determining whether any defects existed in the machinery which would prevent its proper functioning, which could not be determined until the machinery was erected with steam connection “ and the electrical unit connected to a switchboard with a measuring apparatus to indicate whether the generator was operating.” When the inspection was made at Washington the equipment was on skids ready to be crated. The flywheel had been removed. Not only, therefore, did the terms of the contract inform plaintiffs of what they were undertaking and what was required of them as a *412 compliance with the contract, but their subsequent action confirms the fact that they fully understood the nature of their undertaking. When, after considerable delay in transportation, the shipment arrived at Capitan it coul'd only be examined in its crated condition.' It was not until it had been unloaded from the car and transported several miles over a dirt road that it was uncrated, and carefully inspected. The report of the inspection to which it was then subjected is very full, the different parts having been carefully examined. We do not emphasize these, because the machinery was known to be secondhand when the proposal was accepted. But there were broken spokes in the flywheel and certainly the defendant could not be expected to connect the machinery with that in operation, to test the Harrisburg engine “ in parallel with the Skinner engine ” and take chances on what might occur by the use of a broken flywheel. Readily, plaintiffs undertook to replace the flywheel. In order to do this it was found that the manufacturer required the shipment of the armature crank shaft and the old-flywheel. This apparently was determined ■ to be impractical. A claim was made by plaintiffs against the carrier on account of the flywheel. After considerable correspondence they were informed that the defects disclosed were so serious as to preclude satisfactory operation of the unit in accordance with the contract and they were afforded the option of shipping back the machinery to the manufacturer to have it comply with the contract requirements or submitting to a rejection and were requested to inform the department what action they would take. The entire machinery was prepared for its return at plaintiffs’ request and in November it was reshipped by plaintiffs to themselves at Washington. They informed the department of this and requested it to use its efforts with the railroads to expedite delivery. Replying to this letter relative to reshipment, the department wrote on December 4 that the letter indicated that no action would be taken by plaintiffs to make the apparatus satisfactory and “ the contract is therefore hereby revoked.” There was no claim while the equipment was still at the sanatorium that plaintiffs had done all their contract required.There was no demand that the equipment be installed and *413 tested or the broken flywheel be used. To the contrary, the plaintiffs wrote in reply to the department’s letter of December 4, “ this equipment was made useless by breakage in transit, a condition over which we had no control and on account of such defect apparatus was rejected some time ago and is now in transit back to us in Washington.” “ Of course, if it was accepted by them without protest, this was a complete rescission of the contract and plaintiff would have' no right of action.” Warder v. Pischer, 110 Wis. 363, 366. Accepting this situation they requested the return of their certified check “ deposited as a guarantee of the faithful performance of this operation.” This request was complied with. Afterwards the plaintiffs sold the equipment for $700, but a new. flywheel was used upon it. It worked .satisfactorily but whether it would have met the tests required by the contract or could operate in parallel with a Skinner engine does not appear. Moreover, there is an entire absence of proof that any “ shunt ” was sent at any time. The findings show that the use of a shunt was necessary because the Sprague dynamo already installed at the hospital “ possessed field characteristics differing from those prevailing in the Harrisburg unit and the effect of the shunt would be to adjust those differences.” If the equipment had been installed and upon trial had failed to do what the contract contemplated it could not be said that any obligation to pay for it existed. Payment was to be made when the equipment met the prescribed conditions. The receipt of the goods at the railroad station was not an acceptance of property in them. See Philadelphia Whiting Co. v. Detroit White Lead Works, 58 Mich. 29; McNeal v. Braun, 53 N. J. L. 617. The plaintiff’s contention, however, is that the Government was bound to keep the property or at any rate to pay the contract price for it, with the added cost of its transportation to Washington and storage. “We do not think that such is the law. When the subject matter of a sale is not in existence or not ascertained at the time of the contract, an undertaking that it shall, when existing or ascertained, possess certain qualities, is not a mere warranty, but a condition, the performance of which is precedent to any obligation upon the vendee under the contract, because the *414 existence of those qualities, being part of the description of the thing sold becomes essential to its identity and the vendee can not be obliged to receive and pay for a thing different from that for which he contracted.” Pope v. Allis, 115 U. S. 363, 371. The contract in the instant case was more than an engagement to sell certain equipment and deliver- it f. o. b. cars at Capitan. It was an engagement that this equipment would “ possess certain qualities ” in that it would parallel with another engine, and until this fact was ascertained it was not to be paid for. Aside from other defects developed on examination at the sanatorium, the broken flywheel and the absence of shunt excused the failure to make any test, even if the removal of the equipment by the plaintiffs had not led to a similar condition. The view we take of this contract seems to be the view the plaintiffs took of it as evidenced by their conduct. In addition to what has been said, it is significant that after reshipping the equipment to themselves in December, 1918, and so far exercising absolute dominion over it as to sell it in Washington, the plaintiffs made no effort to supply other equipment to the Government and waited nearly four years before making any claim on account of the contract. The suit in this court was begun more than five years -after the equipment reached Capitan in 1918. This conduct, as well as the correspondence cited, shows an acquiescence by plaintiffs in the Government’s position that is unexplainable on any other theory than that the contract was mutually rescinded. The law is settled that even after an acceptance which may transfer title the purchaser. may, under the contract, have the right to rescind as for a condition subsequent if the article does not correspond with the specifications. Delaware, Lackawanna & Western Railroad Co. v. United States, 231 U. S. 363, 372. The conduct of both parties in the case justifies the conclusion that both of them assented to the rescission of the contract. Florence Mining Company v. Brown, 124 U. S. 385, 390. See also Smith v. York Co., 58 N. J. L. 242, and Dougherty v. Neville, 186 N. Y. 578. The petition should be dismissed. And it is so ordered.
Moss, Judge; Graham, Judge; and Booth, Judge, concur.
GreeN, Judge, took no part in the decision of this case.